698 P.2d 315

**Edward J. BLAKE, as Guardian ad litem for Dessie Amindia Blake, a minor, Edward J. Blake, and Sharron Blake, Plaintiffs-Appellants,**

v.

**Amado J. CRUZ, M.D., Defendant-Respondent.**

No. 14510.

Supreme Court of Idaho.

Sept. 18, 1984.

On Rehearing April 4, 1985.

Eli Rapaich and Daniel L. Spickler, Lewiston, for plaintiffs-appellants.

Richard C. Fields and Candy R. Wagahoff, Boise, for defendant-respondent.

HUNTLEY, Justice.

This appeal presents two questions of first impression for this court: (1) whether to recognize a cause of action for "wrongful birth", an action brought by parents against a physician whose professional negligence resulted in the birth of a child with congenital defects; and (2) whether to recognize a cause of action for "wrongful life", where the action is brought by or on behalf of a child against a physician whose negligence caused the child's birth.

We are also called upon to determine when the statute of limitations commences to run on a wrongful birth action. The trial court held, in granting the defendant's motion for summary judgment, that the wrongful birth cause of action accrued, not at the time of birth, but rather at the time of the doctor's negligent act, resulting in the action not having been timely filed. The court further held that wrongful life is not a recognized cause of action in Idaho. It is from this judgment that the plaintiffs appeal. We reverse in part and affirm in part and remand for further proceedings consistent herewith.

On November 29, 1974, Sharron Blake went to the Kamiah Clinic and was examined by Dr. Cruz. She had not been feeling well and suspected that she might be pregnant. She also thought that she might have rubella (German measles), as she had a rash on her neck and had recently been exposed to rubella when her son had the disease. She specifically requested that the doctor test her for both pregnancy and rubella.

Dr. Cruz determined that Mrs. Blake was in the early stages of pregnancy. He diagnosed the rash as roseola and told her that she did not have rubella. He did not draw any blood samples in order to run rubella titer tests to confirm his diagnosis, and he failed to advise her that it was important to have such tests done as soon as possible. (The titer test is the only available definitive diagnostic tool for rubella.) Dr. Cruz informed Mrs. Blake that he was not delivering babies and advised her to see an obstetrician. On December 8, 1974 she saw Dr. Oh who immediately took blood samples to perform the titer test on that and one later date. The results were inconclusive because it was already beyond the appropriate testing period. Dessie Amindia Blake was born on July 3, 1975. The complaint in this case was filed Tuesday, July 5, 1977.

At two weeks of age Dessie was diagnosed as a rubella baby suffering from severe congenital defects. She has nerve deafness, with a 100% hearing loss in her right ear and a 75 decibel loss in her left ear. She wears two hearing aids and her speech is extremely limited. She has visual problems caused by scarring of the retina, a condition which causes vision to be cloudy and spotty, and for which there is no means of correction. She has heart malfunctions which involve deformities of both the valves and arteries and which will eventually require open heart surgery. At the age of three months Dessie was further diagnosed as being grossly hyptonic (Hyptonia is "[a] condition of abnormally diminished tone, tension, or activity," Dorland's Illustrated Medical Dictionary 717 (24th ed. 1965)), with poor head control, and suffering from motor retardation.

The family was forced to move from the rural atmosphere of Kamiah, Idaho to a metropolitan area of Ohio in order to have access to the type of special education and medical attention Dessie requires, as well as to be able to earn enough money to pay for her extraordinary needs. At the time the Blakes made the move, the only special education for the deaf available in Idaho was a residential school in southern Idaho, and Mr. and Mrs. Blake did not want to send their daughter away from home at age three, to be away for the duration of her schooling. Mrs. Blake is a cosmetologist, and formerly ran a successful salon of her own on a full-time basis. Because of Dessie's needs, she is now able to work only one day per week, despite the family's crushing financial burdens.

Dessie requires constant therapy and must see a battery of doctors, therapists and other specialists. She has heart, eye and ear specialists, as well as an audiologist and speech therapist. She has already undergone eye surgery and will have to undergo her open heart surgery by the age of six. Her hearing aids must be replaced every two to three years at a minimum cost of $800, and she needs new ear molds and plugs every three to six months. Dessie attends special education classes for the deaf, but her learning capacity remains uncertain. Her parents have also had to attend classes and meetings themselves in order to learn how to communicate with Dessie and how to live with and rear a child with her disabilities.

Dessie's earning capacity is greatly diminished, and she can expect to continue to incur substantial medical and hospital expenses throughout her lifetime.

The Blakes contend that had Mrs. Blake been positively diagnosed as having rubella she would have had an abortion.

■ The procedural posture of this case is significant in determining this appeal. On motion for summary judgment, the facts are to be liberally construed in favor of the parties opposing the motion and those parties are to be given the benefit of all inferences which might reasonably be drawn from the evidence. *Farmer's Insurance Company of Idaho v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976).

Therefore, we must assume that: (1) Mrs. Blake did have rubella at the time of her examination by Dr. Cruz; (2) had a blood sample been taken by Dr. Cruz on the date of Mrs. Blake's visit to him, the proper tests would have established conclusively that she had rubella; (3) Dr. Cruz was negligent in his medical treatment of Mrs. Blake; and (4) had Mrs. Blake been positively diagnosed as having rubella she would have had the fetus aborted.

## I. WRONGFUL BIRTH

Wrongful birth is a cause of action in the family of an infant, which imposes liability on a defendant for damages and expenses incurred by the parents of a child born with birth defects when, but for the negligence of the defendant, the child would not have been conceived or carried to term. Annot., 83 A.L.R.3d 15 (1978). Its premise is that but for the negligence of the defendant, the child would not have been born.

In this type of action the parents of a child born with birth defects assert that the physician's negligence precluded their making an informed decision about whether to have a child, and that they would have avoided conception or terminated the pregnancy had they been properly advised of the risk of congenital impairment. *E.g., Harbeson v. Parke-Davis, Inc.*, 98 Wash.2d 460, 656 P.2d 483 (1983); *Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981); *Phillips v. United States*, 508 F.Supp. 544 (D.S.C.1981) (*Phillips II*); *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8 (1979). Recovery is therefore sought for the expenses of caring for the disabled child, and for the pain and suffering of the parents. Comment, *"Wrongful Life": The Right Not To Be Born*, 54 Tul.L.Rev. 480, 484 (1980). In considering the case authorities, it is helpful to distinguish a second, related type of action, generally brought by parents of a normal, healthy, but unplanned child. *E.g., Sherlock v. Stillwater Clinic*, 260 N.W.2d

169 (Minn.1977); *Coleman v. Garrison,* 349 A.2d 8 (Del.1975); *Troppi v. Scarf,* 31 Mich.App. 240, 187 N.W.2d 511 (1971). Some courts and commentators have distinguished this category of cases by denominating them "wrongful conception" or "wrongful pregnancy" cases. *Phillips II, supra; Recent Developments, Washington Recognizes Wrongful Birth and Wrongful Life—A Critical Analysis,* 58 Wash.L.Rev. 649 (1983).

Recognition of a cause of action for wrongful birth is of relatively recent vintage. Public policy considerations (now discredited) which prevented its earlier recognition were discussed by the New Jersey Supreme Court in the landmark case of *Gleitman v. Cosgrove,* 49 N.J. 22, 227 A.2d 689 (1967), which denied liability. The first reason was based on the difficulty of measuring damages.

> In order to determine [the parents'] compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries. Such a proposed weighing is similar to that which we have found impossible to perform .... When the parents say their child should not have been born, they make it impossible for a court to measure their damages in being the mother and father of a defective child. 227 A.2d at 693.

The second reason given to justify denial of compensation was:

> [e]ven [assuming] an abortion could [be] obtained without making its participants liable to criminal sanctions, substantial policy reasons prevent ... allowing tort damages for the denial of the opportunity to take an embryonic life. *Id.*

Changes in judicial attitude and the recognition of a woman's constitutionally protected right to obtain an abortion (in the first trimester of pregnancy at least) have led to a wholesale rejection of these arguments.

Considering the difficulty of measuring damages, the New Jersey court, twelve years after its decision in *Gleitman* stated that "to deny [parents] redress for their injuries merely because damages cannot be measured with precise exactitude would constitute a perversion of the fundamental principles of justice." *Berman v. Allan, supra,* 404 A.2d at 15 (allowing emotional damages).

Other courts have similarly found that the difficulty of measuring various damage elements is not an insurmountable obstacle. *E.g., Harbeson v. Parke-Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983); *Phillips II, supra,* at 549–550; *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807, 813–814 (1978); *Jacobs v. Theimer,* 519 S.W.2d 846, 850 (1975).

Regarding the argument founded on the perceived public policy against abortion, the United States Supreme Court ruling in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), established that public policy now supports, rather than militates against, the proposition that a woman not be impermissibly denied a meaningful opportunity to make the decision whether to have an abortion. *Berman, supra,* 404 A.2d at 14. Clearly, the arguments once found persuasive in denying wrongful birth actions have lost their potency. Furthermore, we note at least two policy considerations which have been advanced in favor of recognizing the cause of action.

The first is based upon the expanding ability of medical technology to predict and detect birth defects before conception or birth. Imposing liability on individual physicians vindicates the societal interest in reducing the incidence of genetic defects.[1]

The other consideration flows from general tort principles. A physician whose negligence has deprived a woman of the opportunity to make an informed decision whether her fetus should be aborted should

---

1. For a thorough discussion of this issue, see Note, *Father and Mother Know Best: Defining* *the Liability of Physicians for Inadequate Genetic Counseling,* 87 Yale L.J. 1488 (1978).

be required to compensate her for the damage he has proximately caused. "Any other ruling would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects." *Berman, supra,* 404 A.2d at 14.

■ That society has a vested interest in reducing and preventing birth defects, and in requiring that wrongdoers redress the natural and probable consequences of every substantial breach of the applicable duty of care has led to unanimous acceptance by the courts of wrongful birth as a claim for relief. It has ultimately been recognized by all of the thirteen jurisdictions that have considered it.[2] *See e.g., Fassoulas v. Ramey,* 450 So.2d 822 (S.Ct. Fla.1984); *Harbeson v. Parke-Davis, supra* (Washington); *Turpin v. Sortini,* 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954 (1982); *Robak v. United States,* 658 F.2d 471 (7th Cir.1981) (construing Alabama law); *Phillips II, supra,* (construing South Carolina law); *Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981); *Troppi v. Scarf, supra,* (Michigan); *Berman v. Allan, supra,* (New Jersey); *Becker v. Schwartz, supra,* (New York); *Sherlock v. Stillwater Clinic, supra,* (Minnesota); *Bowman v. Davis,* 48 Ohio St.2d 41, 2 Ohio Op.3d 133, 356 N.E.2d 496 (1976); *Jacobs v. Theimer, supra,* (Texas); *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975). We approve of this trend and hold that negligence resulting in the birth of a deformed or defective child is actionable.

■ Determination of the rights and duties of parties to a wrongful birth action involves analysis of the concepts fundamental to any negligence action: duty, breach, proximate cause and damages.[3]

■ The right of parents to decide whether to prevent the birth or conception of a child has been definitively established within the last decade. *See, e.g., Roe v. Wade, supra; Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Correlative to this right is the duty of the health care provider to not deprive the parents of the opportunity to make a decision that is meaningful and informed. *See, e.g., Harbeson, supra,* 98 Wash.2d at 49, 656 P.2d 483; *Schroeder v. Perkel, supra,* 87 N.J. at 63, 432 A.2d at 834 (1981); *Speck v. Finegold, supra.* For although

"[t]he availability of means to determine in many cases the risk that genetically defective children will be born adds a new dimension to parental decisions regarding childbearing, ... [p]rospective parents ... cannot be expected to obtain this knowledge on their own; the risk must be detected by medical experts and effectively communicated to the prospective parents." Note, *Father and Mother Know Best: Defining the Liability of Physicians for Inadequate Genetic Counseling,* 87 Yale L.J. 1488, 1494 (1978).

Consequently, the negligent failure of a physician to perform a procedure, the results of which would have yielded information material to the parents' decision whether to abort the fetus, constitutes a breach of that duty.

■ The injury in a wrongful birth claim is the birth of the child. This is the "inevitable consequence of recognizing the parents' right to avoid the birth of a defective child." *Harbeson, supra,* 656 P.2d at 492. With this in mind the element of proximate cause does not present an obstacle to the wrongful birth analysis, assuming that the parents allege and show that, but for the physician's negligence, they would have terminated the pregnancy or avoided con-

---

**2.** Several courts have rejected claims based on the birth of normal healthy children, however no court has rejected claims involving children with birth defects.

**3.** "The unanimity of the jurisdictions that have considered wrongful birth cases [involving birth defects] demonstrates that the claim satisfies the traditional requirements for a negligence action: duty, breach, proximate cause, and damages." Rogers, *Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing,* 33 S.C.L.Rev. 713, 749 (1982).

ception, and therefore no child would have been born.

■ The problematic area in the tort of wrongful birth is the issue of damages. "[T]he question of damages has presented a difficult and troublesome problem to the courts ... engendering widely divergent approaches ...." *Phillips II, supra,* 508 F.Supp. at 551. Generally, courts allow the extraordinary expenses relating to the defect that must be borne by the parents, and some courts have compensated for the parents' pain and suffering and mental anguish. *Rogers, Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing,* 33 S.C.L.Rev. *supra,* 713, 751. One court has allowed all expenses incident to the care of the child, without discounting for expenses of child rearing not due to the defect. *Id.*

We find guidance for determining allowable elements of damage in that Idaho law which deals with recovery by parents in the case of the injury or death of a child. Generally, damages may be given as are "just" under all the circumstances of the case. Idaho Code § 5–311. Specifically, damages have been allowed to compensate for the costs of medical and hospital care, *Hayward v. Yost,* 72 Idaho 415, 242 P.2d 971 (1952), and for emotional distress, *Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 606 P.2d 944 (1980). Grief and anguish are not allowable elements of recovery. *Volk v. Baldazo,* 103 Idaho 570, 651 P.2d 11 (1982); *Packard v. Joint School District No. 171,* 104 Idaho 604, 661 P.2d 770 (App.1983). Although the recovery allowed in these cases is based on physical injury or death of the child, as opposed to the birth of the child being the injury, these cases reflect a policy of compensating parents for both pecuniary loss and emotional injury. We find that same policy persuasive in the context of a cause of action for wrongful birth. In determining damages for emotional injury, countervailing emotional benefits attributable to the birth of the child should also be considered and the award adjusted accordingly. Restatement (Second) of Torts § 920 (1977); *Rogers, supra,* 752.

In *Phillips v. United States,* 575 F.Supp. 1309 (D.S.C.1983) (*Phillips IV*),[4] the court had under consideration a case where, as here, the birth defects were such as would render the child relatively helpless and dependent upon its parents for the duration of its life. In *Phillips IV,* the court, while rejecting a cause of action in the child for wrongful life, held that extraordinary expenses, medical, custodial and otherwise, necessitated by the child's condition from birth to an estimated life expectancy of forty years, were recoverable in the parents' cause of action for wrongful birth.[5]

---

**4.** *Phillips IV* addresses the question of damages in a wrongful birth claim. Up to this point our discussion of the *Phillips* case has focused on the earlier *Phillips II* decision, 508 F.Supp. 544 (D.S.C.1981), wherein the court recognized the wrongful birth cause of action.

**5.** The court in *Phillips IV, supra,* analyzed the permissible damage award as follows:

Dr. Wood established the present value of the economic costs subsequent to trial with several different scenarios, as reflected in Plaintiff's Exhibit 13 ... These calculations incorporated three different care proposals: home care with private sitter, institutional care at the Coastal Center (Ladson), and institutional care in a residential group home. After a careful and circumspect review of all the evidence, this court finds that Randy's condition will necessitate that he remain at home and receive attendant care there until he reaches age 18.42, this being fourteen years

from the date of trial. The present economic value of this element of damages is Four Hundred Fifty Thousand, Two Hundred Two and no/100 ($450,202.00) Dollars. This element must be reduced by the cost of raising a "normal" child until the same age. This cost is calculated to be Sixty-Two Thousand, Five Hundred and no/100 ($62,500.00) Dollars. Thus, the net allowable economic loss from birth to age 18.42 is Five Hundred Twelve Thousand, Three Hundred Seventy-One and no/100 ($512,371.00) Dollars.

Having found that Randy Phillips will need attendant care at home until age 18.42 years and that he has a prospective life expectancy of forty years, this court finds that his condition will necessitate his transfer to a residential group home, where he will remain from age 18.42 years to age forty years. Dr. Wood calculated the present value of this element of damages to be Seven Hundred Seventy-One Thousand, Three Hundred Ninety-Four

In *Lieberman v. Lieberman*, 517 S.W.2d 478 (Mo.1974) the court, having under consideration a similar circumstance, stated:

The plaintiff, by his petition, asserts the parental obligation to provide support and seeks benefits as an adult child. Absent special circumstances, a parent is under no duty to support an adult child. 67 C.J.S. Parent and Child § 17, p. 704. This general rule found application in *State ex rel. Kramer v. Carroll, supra,* at 659 [9], as follows:

"Ordinarily, however, in the absence of constitutional or statutory provisions or contractual relations to the contrary, the obligation of the parent to support a child ceases when the child reaches his majority ... The law regards the normal child as capable of supporting himself at the age of twenty-one years."

A recognized exception occurs where the adult child is unmarried, unemancipated and insolvent and physically or mentally incapacitated from supporting himself. *Fower v. Fower Estate,* 448 S.W.2d 585 (Mo.1970). The parental duty of support in such cases may continue past chronological majority when, because of physical or mental infirmity, the child is unable to provide for his support and undertake the responsibilities normally associated with his age. The duty on the parent to provide post-majority support arises not from the nature of the support or benefits sought, but from the condition of the child seeking the benefit. 517 S.W.2d at 480.

In Idaho, the duty of parents to maintain a child unable to maintain himself or herself is established by Idaho Code § 32–1002 which reads in part as follows:

**32–1002. Reciprocal duties of support.**—It is the duty of the father, the mother and the child or children of any poor person who is unable to maintain himself or herself by work, to maintain such poor person to the extent of his or her ability.

We likewise hold that the expenses for the support and maintenance of Dessie Blake beyond the age of majority are recoverable in the parents' action for wrongful birth to the extent such expenses will be reasonably established through competent evidence at trial. Additionally, as in *Phillips IV,* the economic award will be placed in trust for the use and benefit of the child.

## II WRONGFUL LIFE

Wrongful life as a tort is comprised of "those causes of action *brought by the infant* alleging that, due to the negligence of the defendant, birth occurred...." *Curlender v. Bio Science Laboratories,* 106 Cal.App.3d 811, 817, 165 Cal.Rptr. 477, 481 (1980) (emphasis in the original). With the exception of two jurisdictions, the courts have almost universally refused to recognize the tort, even in the most sympathetic of cases—those involving children born with birth defects. *E.g., Speck v. Finegold,* 497 Pa. 76, 439 A.2d 110 (1981); *Berman v. Allan,* 80 N.J. 421, 404 A.2d 8 (1979); *Elliot v. Brown,* 361 So.2d 546 (Ala. 1978); *Becker v. Schwartz,* 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Jacobs v. Theimer,* 519 S.W.2d 846 (Tx. 1975); *Dumer v. St. Michael's Hospital,* 69 Wis.2d 766, 233 N.W.2d 372 (1975); *c.f. Curlender, supra; Harbeson v. Parke-Davis, Inc.,* 99 Wash.2d 460, 656 P.2d 483 (1983) (recognizing the cause of action). This judicial reticence stems partially from the fact that the theory amounts to a repudiation of the value of human life. The contention of wrongful life plaintiffs is not that they should not have been born without defects, but rather, that they should not have been born at all. *Gleitman, supra,* 227 A.2d at 692. The essence of such claims is that the child's very life is "wrongful". *Berman v. Allan, supra,* 404 A.2d at 11.

and no/100 ($771,394.00) Dollars. Thus, the total economic damages from Randy's birth to his life expectancy of forty years is One Million, Two Hundred Eighty-Three Thousand, Seven Hundred Sixty-Five and no/100 ($1,283,765.00) Dollars. *Phillips IV,* at 1317.

■ We also decline to adopt the doctrine which would recognize such a cause of action. Basic to our culture is the precept that life is precious. As a society, therefore, our laws have as their driving force the purpose of protecting, preserving and improving the quality of human existence. To recognize wrongful life as a tort would do violence to that purpose and is completely contradictory to the belief that life is precious. The fact that Dessie Blake will live in a severely disabled condition is unquestionably a tragedy; nevertheless, we agree with the New Jersey Supreme Court in that "life—whether experienced with or without a major physical handicap—is more precious than non-life." *Berman, supra,* at 404 A.2d at 12. Thus, because Dessie Blake has suffered no legally cognizable wrong by being born, she has no cause of action.

Even if we were to hold that wrongful life were a legally cognizable injury in Idaho, the impossibility of measuring damages would in any event preclude recognition of the cause of action.

As the court noted in *Berman, supra* : The primary purpose of tort law is that of compensating plaintiffs for the injuries they have suffered wrongfully at the hands of others. As such, damages are ordinarily computed by "comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a result of the negligence." *Id.* [49 N.J.] at 28, 227 A.2d at 692; *see generally,* W. Prosser, *supra,* § 55 at 335–338; Note, "Wrongful Life and A Fundamental Right to be Born Healthy," 27 Buffalo L.Rev. 537, 555–559 (1978). In the case of a claim predicated upon wrongful life, such a computation would require the trier of fact to measure the difference in value between life in an impaired condition and the "utter void of nonexistence." *Gleitman, supra,* 49 N.J. at 28, 227 A.2d 689. Such an endeavor, however, is literally impossible. As Chief Justice Weintraub noted, man, "who knows nothing of death or nothingness," simply cannot

affix a price tag to non-life. *Id.* at 63 [227 A.2d 689] (Weintraub, C.J., concurring & dissenting).

Accordingly, we hold that the trial court did not err in entering summary judgment disallowing a cause of action for "wrongful life".

### III.  STATUTE OF LIMITATIONS

■ The statute of limitations applicable to the parent's cause of action is set forth in Idaho Code § 5–219(4) which governs, inter alia, medical malpractice. Under § 5–219(4) an action must be brought within two years of the "occurrence, act or omission complained of." Respondent asserts that the Blakes are therefore barred, since the negligent medical treatment occurred in November of 1974, approximately two years and seven months before the complaint was filed on July 5, 1977. Such an interpretation is incorrect however.

As we have said, "[t]he gist of a malpractice action is negligence." *Umphrey v. Sprinkel,* 83 I.S.C.R. 1497, 106 Idaho 700, 682 P.2d 1247 (1983); *Trimming v. Howard,* 52 Idaho 412, 416, 16 P.2d 661, 662 (1932). "It is axiomatic that in order to recover under a theory of negligence, the plaintiff must prove actual damage. As a general rule 'the statute of limitations does not begin to run against a negligence action until some damage has occurred.'" *Stephens v. Stearns,* 106 Idaho 249, 254, 678 P.2d 41, 46 (1984). Since under the cause of action for wrongful birth, there is no defective child until and unless the birth occurs, logic dictates that the statute of limitations cannot begin to run until the date of birth, which was July 3, 1975. Although the complaint was not actually filed until July 5, 1977, it is not barred as July 3 was a Sunday and July 4 was a legal holiday. Accordingly, the Blakes' case was timely instituted.

The judgment of the lower court is affirmed in part and reversed in part and the cause remanded for further proceedings. Each party to bear their respective costs and attorney fees.

DONALDSON, C.J., and SHEPARD, J., concurring.

BISTLINE, J., concurring in Parts I and III and dissenting as to Part II.

BAKES, J., concurring in part as to Part I, concurring in Part II, and dissenting in Part III.

BISTLINE, Justice, dissenting in Part II.

Putting aside the semantic phraseology which has unfortunately attached to discussion by scholars and jurists, I will briefly delineate my views pertinent to this particular case. The court is unanimously of the view that the parents of Dessie Blake are possessed of a cause of action against the defendant. Justice Bakes does not agree with the Court's application of the statute of limitations. The cause of action in the parents which is upheld is based upon the claim for damages which will allegedly result in caring for a child who because of defendant's negligence arrived in this world with handicapping defects.

It is inconceivable that the child herself is at the same time held to have no remedy whatever for her handicapped condition which allegedly would not have existed except for negligence. All that is necessary to place the child's cause of action in perspective is to subtract the parents from the equation, and then by legal analysis pursue the problem to its logical conclusion.

The parents of a child, be it born a normal or abnormal child, are morally and lawfully obligated for its care. In the ordinary situation, such as here, the parents are entitled to damages some of which are the extra costs of caring for a handicapped child as against caring for the child if there were no handicaps. They are not entitled to any of the general damages which the child itself, an injured third party, has incurred by reason of her condition. It is beyond cavil that our society continues to recognize that all who have suffered permanent injury at the hands of another are entitled to compensation from the tortfeasor. This Court recently committed itself to the proposition that an unborn child is a person in being. For that very reason alone, where the unborn child is injured at the hands of a negligent tort-feasor, and dies from those injuries before leaving the mother's womb, we held that the parents are possessed of a cause of action for the wrongful death of the unborn child. *Volk v. Baldazo*, 103 Idaho 570, 651 P.2d 11 (1982). In that case we recognized that "As a predicate to a wrongful death action for the death of a child, this Court has consistently required that the child would have been able to maintain an action for injury if death had not resulted." *Volk, supra*, at 572, 651 P.2d at 13. After noting that the "The great majority of jurisdictions have permitted the cause of action on behalf of a child who sustained prenatal injuries and was subsequently born alive," we quoted a passage from *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and § 869 of the Restatement of Torts, and announced our holding:

> "Based on what we deem to be the modern trend and the clear weight of authority, we hold that in Idaho a cause of action will lie on behalf of a viable child who sustains prenatal injuries, but is subsequently born alive."

*Volk, supra*, at 572, 651 P.2d at 13. The foregoing holding was integral and essential to our further holding in that case that Idaho law recognized a cause of action for the wrongful death of an unborn child, provided only that it have been a viable fetus. 103 Idaho at 574, 651 P.2d at 15. Under our holding of *Volk*, then, there is clearly a right *in a child* to recover damages for injury caused by third party negligence which occurred prior to the child's birth. Although that holding was limited to the facts of that case, however, which included an indisputably viable full-term unborn baby, nevertheless, in relying upon the Restatement, § 869, "(1) One who tortiously causes harm to an unborn child is subject to liability to the child for the harm if the child is born alive," we immediately added:

> "The comment to subsection (1), states that liability:

'is not limited to unborn children who are "viable" at the time of the original injury, that is, capable of independent life, if only in an incubator. If the tortious conduct and the legal causation of the harm can be satisfactorily established, there may be recovery for any injury occurring at any time after conception.'"

*Volk, supra,* at 572, 651 P.2d at 13. Dessie's cause of action is wholly independent of the action which the parents have brought. To comprehend this it is only necessary to conjure up a situation where a defective child is born to indigent parents who a few days later both perish in an automobile collision. The obligation of the parents to bear the expenses of caring for their child is extinguished. At this point a guardian is appointed for the child, and through the guardian the child brings an action to recover damages against those persons or entities who are allegedly responsible in negligence for the defects with which the child was born, and with which the child will be burdened through life. Some of those damages will be the same damages which the parents would have sought, i.e., the increased costs and expenses of caring for a child born with defects. Where the parents are alive, however, the right to *such* damages also accrues to them, properly apportioned to the life expectancies of the parents and the life expectancy of the child. Obviously, a double recovery for those special damages cannot be imposed upon the alleged tort-feasor in favor of the parents and the child.

The child, however, who by reason of negligence has been afflicted with diminished hearing, diminished eyesight, and diminished speech, is also entitled to be compensated for those injuries just as any other human being is entitled to damages for such injuries. There is nothing new or remarkable in the concept of awarding to a handicapped child those damages which are caused by injuries attributable to third-party negligence.

Here, as the opinion for the Court points out, Dessie was born on July 3, 1975. Her mother saw the defendant professionally seven months earlier, concerned that she was then pregnant and had German measles. The defendant confirmed the pregnancy. At stake at that very instant the pregnancy was confirmed was the fate of Dessie, if her mother then did indeed have German measles. Beyond any doubt the defendant's obligation was to the mother and as well to the conceived but unborn child. Despite the known or should-have-been-known consequences of his misdiagnosis, he did not, as the Court's opinion points out, draw any blood in order to run rubella titer tests to confirm his diagnosis; nor did he tell her that it was important to have such tests done as soon as possible. Dessie was born, and Dessie lives. But the Dessie that lives is not a normal child, but a grievously injured child.

Although the parents' action on their own behalf suggests that *their* claim for damages is predicated upon a contention that an abortion would have been procured had they been given a correct diagnosis, which in some eyes that might be seen as also suggesting a responsibility to so mitigate damages, (which I very much doubt) it is not readily seen just how they are required to after-the-fact speculate what they might or might not have done. The fact of the matter is that they do allege a misdiagnosis, and that Dessie was consequently born with serious defects which necessitate considerable expenditures of money which they seek to recover, both past and future.

For absolute certain, however, Dessie's lawsuit does not in any way hinge on such speculation. The plaintiff Dessie was born, and has defects allegedly attributable to the failure to diagnose her mother's German measles. With Dessie's case, we take the facts as they are. Although she might never have been born to live crippled, had her parents been properly informed, the fact is that she was born, and the condition in which she was born is allegedly chargeable to the defendant.

In *Volk*, we mentioned *Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108 (1958). That court said:

"[I]t seems to us that if an infant is born alive and survives bearing physical or mental injuries medically provable to have been incurred by it while *en ventre sa mere* it is being oblivious to reality to say that the mother alone was injured by the tortious act and not the child. This court in *Prescott v. Robinson*, 74 N.H. 460, 463, 69 A. 522, 524, 17 L.R.A.,N.S., 594, said that *from 'the time of the injury to the time of the birth the mother suffers no physical damage merely because the child's limbs are distorted, or because its health is impaired * * * the child alone suffers damage on that account * * * the injuries suffered by each are distinct and independent.'* "

*Bennett, supra,* 147 A.2d at 109–110 (emphasis added).

and

"In weighing the factors for and against allowing recovery we are impressed with the injustice of denying to a child born alive a right to recover for injuries which he might bear for the remainder of his life because of the tortious conduct of another. *'One cannot examine the cases in which a child, physically or mentally deformed for life as a result of prenatal injuries caused by the wrongful act of another, has been denied a right of recovery for such injuries, without being impressed by the harshness of such a result.'* Annotation 10 A.L.R.2d 1059, 1071.

"We hold therefore that an infant born alive can maintain an action to recover for prenatal injuries inflicted upon it by the tort of another even if it had not reached the state of a viable fetus at the time of injury. We so decide because we see no logical reason for not extending the protection of the law of torts to it and are impressed by the harshness of the opposite result. We recognize that there may be difficulty in proving causation and that such a holding may give rise to fictitious claims. However this difficulty and this danger are not peculiar to this type of action and do not appear to be so much greater than in the case of many other matters of medical opinion on the causal sequence of events. Our holding, that if a child born alive after an injury sustained at any period of its prenatal life can prove the damage was caused by the tort it makes out a right to recover, is in accord with certain recent judicial opinions, modern medical science and the view of many writers on the law of torts."

*Bennett, supra,* at p. 110 (emphasis added).

A unanimous opinion from New York is of the same view:

"The complaint alleges that plaintiff was injured by the negligence of the defendant in operating an automobile which struck and knocked down plaintiff's mother while she was walking over a crosswalk. She was then in the third month of her pregnancy. The result, so the complaint alleges, was that plaintiff was born weakened and debilitated and otherwise physically handicapped. While the point at which the foetus becomes viable has been of usefulness in drawing some legal distinctions, the underlying problem that has usually troubled the judges who have written on the subject of recovery for pre-natal injuries, has been in fixing the point of legal separability from the mother.

"We ought to be safe in this respect in saying that legal separability should begin where there is biological separability. We know something more of the actual process of conception and foetal development now than when some of the common law cases were decided; and what we know makes it possible to demonstrate clearly that separability begins at conception.

"The mother's biological contribution from conception on is nourishment and protection; but the foetus has become a separate organism and remains so throughout its life. That it may not live if its protection and nourishment are cut

off earlier than the viable stage of its development is not to destroy its separability; it is rather to describe conditions under which life will not continue. Succeeding conditions exist, of course, that have that result at every stage of its life, post-natal as well as pre-natal. The complaint here, in alleging that plaintiff was in being in the third month of his mother's pregnancy, alleges a conclusion of fact consistent with generally accepted knowledge of the process.

"The logic of some of the cases sustaining the right of recovery where the injury occurred after the foetus was viable seems to be that if at the instant of injury the foetus were outside the womb it could live and would then be treated at law as an individual in being. But no case imposed as a necessity the concomitant condition that actual miscarriage must coincide with the injury. Hence the basis of separability discussed was often a theory rather than a fact."

and

"If the child born after an injury sustained at any period of his pre-natal life can prove the effect on him of the tort, as for the purpose of this appeal and on the face of the complaint before us we must assume plaintiff will be able to do, we hold he makes out a right to recover."

*Kelly v. Gregory*, 282 A.D. 542, 125 N.Y. S.2d 696 (1953).

The Supreme Court of Georgia similarly ruled that "If a child born after an injury sustained at any period of its prenatal life can prove the effect on it of a tort, it would have a right to recover." *Hornbuckle v. Plantation Pipe Line Co.*, 212 Ga. 504, 93 S.E.2d 727. In *Seattle-First National Bank v. Rankin*, the Supreme Court of Washington, en banc, had before it a case where the minor plaintiff (through its guardian the bank) had prevailed in an action where it was alleged, inter alia, "that the plaintiff's mother was suffering from a serious anemia during pregnancy and the defendant negligently failed to discover the condition and take proper steps

to correct it . . . ." Citing *Bennett v. Hymers, supra,* and other cases, the Washington court stated, "We have examined the cases in point, and conclude that the more just rule is that which permits a claim to recover for prenatal injuries." 367 P.2d 835, 838 (1962).

In *Sylvia v. Gobeille*, 101 R.I. 76, 220 A.2d 222 (1966), the Supreme Court of Rhode Island overruled a long-standing case, which precluded liability for pre-natal injuries, saying that "We do this in part because we believe the law in this state should be harmonious with that which now prevails elsewhere. . . . We deem it fitting and proper to protect a child's right to commence life unhampered and unimpaired by damage negligently caused to his body or mind by another." 220 A.2d at 223. Also citing *Bennett v. Hymers* and other authority, that court went on to say:

"While we could, as has sometimes been done elsewhere, justify our rejection of the viability concept on the medical fact that a fetus becomes a living human being from the moment of conception, we do so not on the authority of the biologist but because we are unable logically to conclude that a claim for an injury inflicted prior to viability is any less meritorious than one sustained after. In our view, subject always, however, to Prosser's caution, supra at 357, that there must be reliable proof of causation, 'justice requires that the principle be recognized that a child has a legal right to begin life with a sound mind and body,' and that 'If the wrongful conduct of another interferes with that right, and it can be established by *competent proof* that there is a causal connection between the wrongful interference and the harm suffered by the child when born, damages for such harm should be recoverable by the child.' (Italics ours.) *Smith v. Brennan*, 31 N.J. 353, 364, 157 A.2d 497, 503.

"With us the test will not be viability but causation, and our inquiry will be whether the damage sustained is traceable to the wrongful act of another. Our conclusion is in line with the recent deci-

sions. *Sinkler v. Kneale*, 401 Pa. 267, 164 A.2d 93; *Kelly v. Gregory*, 282 App. Div. (N.Y.) 542, 125 N.Y.S.2d 696; *Hornbuckle v. Plantation Pipe Line Co.*, 212 Ga. 504, 93 S.E.2d 727; *Bennett v. Hymers*, 101 N.H. 483, 147 A.2d 108; *Puhl v. Milwaukee Automobile Ins. Co.*, 8 Wis.2d 343, 99 N.W.2d 163; *LaBlue v. Specker*, 358 Mich. 558, 100 N.W.2d 445.

"Because the injured child in the instant case is in being, we do not reach the problem, more troublesome perhaps than that of viability, of whether a child must be born alive in order to maintain an action for injuries sustained while *en ventre sa mere*. We decide only the issue before us and we hold that a child born alive has a right of action in tort against a negligent wrongdoer for prenatal injuries."

*Sylvia, supra*, at 223–24.

Six years earlier the Supreme Court of New Jersey, after a thorough review of then available authority, likewise overruled an earlier case where it had denied the right of a minor to sue for prenatal injuries. The entire opinion is recommended reading. I point only to a passage which illustrates that court's turnabout:

"From the foregoing it is clear that medical authorities recognize that before birth an infant is a distinct entity, and that the law recognizes that rights which he will enjoy when born can be violated before his birth. If the law in cases of negligently inflicted prenatal injuries were to disregard this background and consider an unborn child as part of its mother, then the mother should be able to recover for the pain, suffering, and incapacity to this part of her, just as to any other part. We know of no case allowing such recovery. As early as 1908, the New Hampshire Supreme Court specifically denied it, holding that '[s]uch damages pertain to the child alone. The mother is no more entitled to them than the father is.' *Prescott v. Robinson*, 74 N.H. 460 at page 463, 69 A. 522 at page 524, 17 L.R.A.,N.S., 594. If neither mother nor child can recover, then a life impaired by another's fault

must be endured without the recompense which the law provides for other persons wrongfully injured. The law should take care that, wherever possible, a wrong should not go completely unrequited.

"The semantic argument whether an unborn child is a 'person in being' seems to us to be beside the point. There is no question that conception sets in motion biological processes which if undisturbed will produce what every one will concede to be a person in being. If in the meanwhile those processes can be disrupted resulting in harm to the child when born, it is immaterial whether before birth the child is considered a person in being. And regardless of analogies to other areas of the law, justice requires that the principle be recognized that a child has a legal right to begin life with a sound mind and body. If the wrongful conduct of another interferes with that right, and it can be established by competent proof that there is a causal connection between the wrongful interference and the harm suffered by the child when born, damages for such harm should be recoverable by the child.

. . . .

"We conclude that the reasons advanced for the decisions denying recovery to a child who survives a prenatal injury are inadequate. They deny basic medical knowledge; they ignore the protection afforded unborn children by other branches of the law, and are founded upon fears which should not weigh with the courts. We believe that a surviving child should have a right of action in tort for prenatal injuries for the plain reason that it would be unjust to deny it. Therefore, the rule of *Stemmer v. Kline* [128 N.J.L. 455, 26 A.2d 489 (1942)] is no longer the law of this State."

*Smith v. Brennan*, 31 N.J. 353, 157 A.2d 497, 502–04 (1960).

The *Berman* case, relied upon in Part II of the majority opinion is not inapposite to the New Jersey court's holding in *Smith*, the injury in that case not being chargeable to medical malpractice but to an automobile

collision. Nor are the facts in *Berman* on a par with the facts in Dessie's case. In *Berman* the alleged medical negligence was in not utilizing a pre-natal procedure known as amniocentesis which allegedly would have revealed a genetic defect. In Dessie's case, however, the claim of negligence is the entirely different claim of the failure to diagnose or discover German measles which were allegedly the cause of Dessie's birth defects. The *Berman* court specifically noted that there was no contention that "absent defendant's negligence she [Sharon] would have come into the world in a normal and healthy state." 404 A.2d at 11. As to claimed damages in *Berman*, that court noted, 404 A.2d at 10, that the parents "request damages in *their own right* both for the emotional anguish which they have experienced and will continue to experience on account of Sharon's birth defect, and on the medical and other costs which they will incur in order to properly raise, educate and supervise the child." The *Berman* court was careful to explicitly distinguish the facts of that case from *Sylvia, supra,* and its own *Smith:*

"As such, this case presents issues different from those involved in malpractice actions where a plaintiff asserts that a defendant's deviation from sound medical practices *increased* the probability that an infant would be born with defects. *See, e.g., Sylvia v. Gobeille,* 101 R.I. 76, 220 A.2d 222 (1966). Nor are we here confronted with a situation in which an individual's negligence while a child was in gestation caused what otherwise would have been a normal and healthy child to come into the world in an impaired condition. *See, e.g., Smith v. Brennan,* 31 N.J. 353, 157 A.2d 497 (1960); W. Prosser, *Law of Torts* § 55 at 335–338 (4th Ed.1971). Here, defendants' alleged negligence neither caused the mongoloid condition nor increased the risk that such a condition would occur."

*Berman, supra,* at 11.

Although the *Berman* court is to be commended for its partial overruling of its earlier *Gleitman* case to the point of allowing the Berman parents a right of recovery for emotional anguish, that is the extent of its holding which has any applicability to this case where we consider the claim of Dessie and the claim of her parents. Obviously, the *ratio decedendi* of that case hinged on the fact of genetic defects and not on negligence and resultant pre-natal injury. As stated in an earlier part of this opinion, putting aside semantical terms such as wrongful birth and wrongful life, the facts of this case are simply that Dessie was born, she lives, and her life in a crippled condition is allegedly attributable to the defendant. As with other injured persons who cannot be restored to physical and mental normality, she should be entitled to general damages which adequately compensate her, and to special damages as well. Her parents, by reason of Idaho law, may also be found entitled to identical special damages, a matter of overlapping to be taken care of at the trial level, and, where they are found to have suffered loss of income and other such damages by reason of being required to devote their time to Dessie, such would seem to be a proper element, along with damages for emotional distress. *See Harbeson,* discussed *infra.*

If it were necessary in order to find a cause of action in a genetically defective child whose birth would not have taken place had there not been negligence in medical procedures or medical diagnosis, in order that there would be a recovery of the extraordinary expenses to be incurred *during the child's life time,* then the views of a *unanimous* Supreme Court of Washington in *Harbeson v. Parke-Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983), are sound and will ultimately prevail in all jurisdictions, just as *Bennett* led other jurisdictions into becoming prevailing majority rule. The Washington court, utilizing the wrongful life terminology first initiated by commentators, noted its earlier case involving pre-natal injuries, *Seattle-First National Bank v. Rankin,* which is herein extensively quoted from, and proceeded to hold that, in a wrongful life action, based on the extension of a physician's duty of care to

"persons not conceived at the time of the negligent action or omission," 656 P.2d at 495, the defective child subsequently born may be entitled to a recovery of incurred and future incurrable extraordinary expenses. And, while there may be some substance to the Washington court's belief that measuring the value of an impaired life as compared to nonexistence is a task that is beyond mortals, it is my view that the law review articles and the New Jersey court have led the Washington court astray—which will all be straightened out in due time. The real comparison to be drawn is between a *normal* life and an impaired life. Nonexistence is oblivion, and nothing can be measured against oblivion—concerning which nothing is known. But society in general, and courts in particular, have forever dealt with reality, the reality of comparing any injured person's condition prior to and after injury.

So that it may be entirely clear, the reason for this separate opinion is to make it crystal clear that I join overwhelming authority which holds that:

(a) A child who was injured by the prenatal negligence of another is possessed of a cause of action, and as with all tortiously injured persons, upon proper proof is entitled to general and special damages. [This is no more than we held in *Volk,* as a predicate to recognizing the right in parents to recover for the death of an unborn child.]

(b) Under Idaho statutory law, the parents also may maintain an action for special damages occasioned by their child being born with crippling defects proven to be attributable to third-party negligence.

(c) Such special damages in (b) may in part be identical to some of the special damages which are recoverable by the child. But, as alleged in this case, the parents also may be entitled to other special damages occasioned, for instance, by loss of income because of being required to confer additional care, attention, and instruction upon the child which would not normally be required.

(d) There are some general damages which are recoverable by the parents, as discussed in cases above-cited and above-quoted.

Now, it may be that the opinion for the Court accomplishes all of the foregoing, and it may be that I am unduly alarmed by the wrongful life discussion in Part II. If there were any need to endorse that doctrine in order to award complete relief, then I would do so. If the majority in Part II is agreeing with the New Jersey court's [1] venture into theology, "that life—whether experienced with or without a major physical handicap—is more precious than non-life," as a talisman for refusing Dessie Blake a recovery of general damages, then I fear that I may have "stepped through the looking glass."

## ADDENDUM

Just a word concerning the dissent of Justice Bakes as to the application of the Statute of Limitations to the parents' cause of action for special damages. His present stance in this case is contrary to what he wrote in dissent in *Ralphs v. Spirit Lake,* 98 Idaho 225, 228, 560 P.2d 1315, 1318–19 (1977). There he wrote to explain the distinction to be properly drawn between tort actions sounding in willfulness and those sounding in negligence:

"First, the complaint in this case alleges a claim against the chief of police and the city of Spirit Lake grounded in negligence. As to these defendants, there is no issue of a battery, or any intentional tort. The defendant police chief allegedly breached his duty to this plaintiff by failing to stop the criminal assault on the plaintiff on the 25th or 26th of May, 1974. The claim against the city was

1. I noted *infra* that the quickening New Jersey court in *Berman* reversed its ten-year-old *Gleitman* holding. As the Washington Supreme Court noted in *Harbeson,* only two years after *Berman,* that court, in *Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834 (1981), did yet another turnabout and brought itself to the conclusion that parents should receive special damages in addition to general damages for mental anguish.

based upon negligence, both vicarious and independent. The 'additional injuries' which were the basis of plaintiff's complaint were not discovered until August 10, 1975.

"While the victim of an intentional tort has a right of action for nominal damages from the time of the wrongful act, this is not the case in negligence actions. Professor Prosser states that a necessary element to a cause of action for negligence is

'[a]ctual loss or damage resulting to the interests of another. Since the action for negligence developed chiefly out of the old form of action on the case, it retained the rule of that action, that proof of damage was an essential part of plaintiff's case. Nominal damages, to vindicate a technical right, cannot be recovered in a negligence action, where no actual loss has occurred.' Prosser, Law of Torts, 4th Ed. (1971), p. 143."

He then observes:

" 'It follows that the statute of limitations does not begin to run against a negligence action until some damage has occurred.' Id., at 144.

"See also the discussion of the actual damage requirement in United States v. Reid, 251 F.2d 691 (5th Cir.1958), cited by the majority and Justice Bistline. It is possible that this plaintiff did not sustain any injuries as would support an action in negligence on the date of the assault and battery, but that the injuries discovered on August 10, 1975, were the first indications that he had suffered actionable damages from the incident. If that were the case, I believe that he did not have a cause of action against the city or the chief of police until that date." Ralphs, supra, at 228–29, 560 P.2d at 1319.

He was eminently correct in that view. Moreover, the statute of limitations is not even a factor in Dessie's right in her own name to have a recovery for those same extraordinary expenses which the parents are also entitled to recover. As I have said, and now note, the same view of the unanimous Washington Supreme Court, wherein it approved of language in Turpin v. Sortini, 31 Cal.3d 220, 182 Cal.Rptr. 337, 643 P.2d 954, 965 (Cal.1982) that "it would be illogical and anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care," it declared:

"The child's need for medical care and other special costs attributable to his defect will not miraculously disappear when the child attains his majority. In many cases, the burden of those expenses will fall on the child's parents or the state. Rather than allowing this to occur by refusing to recognize the cause of action, we prefer to place the burden of those costs on the party whose negligence was in fact a proximate cause of the child's continuing need for such special medical care and training."

Harbeson, supra, 656 P.2d at 495.

BAKES, Justice, dissenting:

I.

I dissent from the majority's application of the statute of limitations set forth in I.C. § 5–219(4). The majority concludes that "the statute of limitations does not begin to run against a negligence action until some damage has occurred," even though the legislature, in I.C. § 5–219(4) has provided that professional malpractice actions "shall be deemed to have accrued as of the time of the occurrence, act or omission complained of . . . ." A review of the history of the amendment to I.C. § 5–219(4) clearly demonstrates how the Court in this case is ignoring the legislature's directive with regard to when the statute of limitations begins to run.

In Renner v. Edwards, 93 Idaho 836, 475 P.2d 530 (1969), Justice Shepard, in responding to the argument that the extension of the Billings discovery rule "should be left to the legislature rather than this Court indulging in judicial legislation," stated:

"Our legislature did not define the time of accrual as being either the time of the performance of the negligent act or the time of the acquisition of knowledge of

the negligent act. That was done by this Court. To adopt the 'discovery rule' is to imply the existence of knowledge as a requirement for the accrual of an action and thus supply knowledge as a statutory requirement. Conversely, to reject the rule is to imply that the legislature considered the requirement of knowledge as an element of accrual and deliberately excluded such terminology from the statute. Legislative inaction should not be ignored in determining legislative intent, but to imply such an intent in this case as a result of legislative inaction is unreasonable. *Berry v. Branner, supra,* [245 Or. 307, 421 P.2d 996 (1966)] At the moment, our statutes, as most others across this country, are silent as to the interrelationship between 'knowledge' and 'accrual.' We are required to reach a decision without assistance from our legislative brethren." *Renner v. Edwards,* 93 Idaho at 840, 475 P.2d at 534 (1970).

The *Renner* case was decided on rehearing on October 8, 1970. Immediately thereafter, in the winter 1971 legislature, an amendment was introduced to I.C. § 5–219(4) which gave this Court the "assistance"—indeed the direction—which this Court stated in *Renner* was lacking at the time it extended the *Billings* discovery rule to that misdiagnosis case. That amendment to I.C. § 5–219(4) specifically provided that in professional malpractice actions (except cases involving foreign objects left in the body) the cause of action "shall be deemed to have accrued as of the time of the occurrence, act or omission complained of ...."

Several subsequent cases have recognized that the 1971 amendment to I.C. § 5–219(4) was enacted to change the result of our *Renner* case. In *Johnson v. Gorton,* 94 Idaho 595, 495 P.2d 1 (1972), Chief Justice McQuade, speaking for a unanimous Court, noted that "the legislature has narrowed the scope of *Renner* through recent enactment of I.C. § 5–219(4) ...." In *Martin v. Clements,* 98 Idaho 906, 575 P.2d 885 (1978), this Court again recognized that the 1971 amendment

to I.C. § 5–219(4) was the legislature's response to this Court's observations in *Renner* that "[o]ur legislature did not define the time of accrual as being ... the time of the performance of the negligent act ...," and that "[w]e are required to reach a decision without assistance from our legislative brethren." The Court in *Martin v. Clements, supra,* stated:

"Since the 1970 decision in *Renner v. Edwards, supra,* and perhaps partially in response to that decision, our legislature in 1971 amended I.C. § 5–219(4) to define when a cause of action accrues for purposes of applying the statutory period of limitation in professional malpractice actions. Under amended I.C. § 5–219(4), a cause of action shall be deemed to have accrued as of the time of the act or omission complained [of, except in foreign object medical malpractice actions] ...." 98 Idaho at 909, 575 P.2d at 888.

Finally, in *Holmes v. Iwasa,* 104 Idaho 179, 657 P.2d 476 (1983), the Court again stressed that by the 1971 amendment the legislature amended I.C. § 5–219(4) to change the rule announced in *Renner* concerning when the statute of limitations begins to run in misdiagnosis cases. The *Holmes* decision states:

"Prior to March 24, 1971, I.C. § 5–219(4), the statute of limitations applicable to professional malpractice actions, in essence provided that an action had to be filed within two years of the alleged professional malpractice; the statute made no reference whatsoever to the interrelationship between the accrual of a cause of action and knowledge of a cause of action. Without the benefit of legislative guidance, this Court adopted the so-called 'discovery exception' in cases in which foreign objects were negligently left in a patient's body. In *Billings v. Sisters of Mercy of Idaho,* 86 Idaho 485, 389 P.2d 224 (1964), we held that 'the cause of action [in such cases] does not accrue until the patient learns of, or in the exercise of reasonable care and diligence should have learned of the presence of [the] foreign object in his body.'

*Id.* at 498, 389 P.2d at 232. In *Renner v. Edwards,* 93 Idaho 836, 475 P.2d 530 (1969), *aff'd on rehearing,* we extended the discovery rule to cases of misdiagnosis and held that the statute of limitations did not begin to run until the patient knew or should have known of the physician's misdiagnosis.

"However, soon after our decision in *Renner,* and perhaps partly in response thereto, the legislature substantially amended I.C. § 5–219(4). 1971 Idaho Sess. Laws, ch. 180, § 1. By amending I.C. § 5–219(4), the legislature narrowed the scope of *Renner* and, in large part, defined when a cause of action accrues for the purposes of applying the statutory period of limitations in professional malpractice actions. Under amended I.C. § 5–219(4), the discovery exception first recognized by this Court in *Billings v. Sisters of Mercy of Idaho,* 86 Idaho 485, 389 P.2d 224 (1964), is limited to cases involving foreign objects and fraudulent concealment. In all other professional malpractice actions, 'the cause of action shall be deemed to have accrued as of the time of the occurrence, act or omission complained of ....' The action must be brought within two years of that time." 104 Idaho at 183–84, 657 P.2d at 478–79 (footnotes omitted).

The action brought by the plaintiffs in the present case is another *Renner*-type misdiagnosis case. The plaintiffs' complaint in this case alleges that Dr. Cruz misdiagnosed Mrs. Blake's condition to be roseola, rather than rubella (German measles), and consequently deprived Mrs. Blake of the knowledge which she needed to make the decision to terminate her pregnancy. The record reflects that Mrs. Blake was pregnant and had the rubella disease before she came to see Dr. Cruz. Dr. Cruz had nothing to do with her contracting the disease, nor could he have administered any medication or treatment which would have ameliorated either her condition or that of the fetus with which she was then pregnant. In short, the only thing Dr. Cruz could have done was advise Mrs. Blake of her condition in order that she could have made the decision to abort the fetus. This is the classic *Renner*-type misdiagnosis case at which the amendment to I.C. § 5–219(4) was directed when the legislature specifically said that the cause of action "shall be deemed to have accrued as of the time of the occurrence, act or omission complained of ...."

It is clear that the legislature knows how to draft a statute which provides for accrual of the cause of action at some later time than "the time of the occurrence, act or omission complained of ...." A good example of such a statute is that considered by this Court in *Ralphs v. City of Spirit Lake,* 98 Idaho 225, 560 P.2d 1315 (1977). In that case the Court was considering I.C. § 6–906, the very short 120-day limitations provision in the Idaho Tort Claims Act. That statute provided that all claims had to be filed "within one hundred and twenty (120) days from the date the *claim arose or reasonably should have been discovered,* whichever is later." However, in the present case, the 1971 amendment to I.C. § 5–219(4) provides that the cause of action shall commence "as of the time of the occurrence, act or omission complained of ...." The legislature obviously knows the difference between a statute of limitations which commences at the time that the alleged tortfeasor commits his act, and some later time when either the injured party learns of it or when some damage shows up. That is pointed out in the 1971 amendment to I.C. § 5–219(4) itself, where the legislature expressly provided that, in the case of foreign objects inadvertently or accidently left in a person's body, the statute of limitations shall not begin to run until "the injured party knows or in the exercise of reasonable care should have been put on inquiry regarding the condition or matter complained of ...."

If we were dealing entirely with a common law rule, or even if we were dealing with I.C. § 5–219 as it existed at the time of *Renner*—i.e., prior to the 1971 amendment—the rule announced by the majority of the Court today might be a good rule. However, the legislature, by the 1971

amendment to I.C. § 5–219(4), has set the policy and this Court should not ignore it.

The majority opinion pretends to be following the statute by stating that when I.C. § 5–219(4) uses the words "professional malpractice ... shall be deemed to have accrued as of the time of the *occurrence,* act or omission complained of ...," the "occurrence" is the birth of the defective child, not what the doctor did wrong. However, in this case the doctor had nothing to do with either the pregnancy (she was pregnant before she ever came to see the doctor), or the disease or injury (she already had rubella when she came to see the doctor), and there was nothing which the doctor could do to alleviate either of those two conditions. The plaintiff is complaining that the doctor misdiagnosed her condition, thereby depriving her of the right to have an abortion. Assuming that the statute by using the word "occurrence" does refer to the damage to the plaintiff not the act of the doctor (which is a twisted interpretation of what the legislature says), the deprivation to this plaintiff was not the "birth of a defective child" but deprivation of her right to have an abortion. Under Roe v. Wade that right only existed unqualifiedly for the first trimester. Under I.C. § 18–608, she had no right to an abortion during the third trimester because under that statute abortions may only be performed during the third trimester when "necessary for the preservation of the life of such woman or, if not performed, such pregnancy would terminate in birth or delivery of a fetus unable to survive." In this case, there is no claim of threat to the life of the mother, or of the ability of the fetus to survive. Therefore, the Blakes' right to an abortion probably lasted only during the first trimester, but in no event did it continue into the third trimester. Thus, even if "occurrence" did mean when the injury occurs, rather than the act which the doctor commits, which is what the statute says, in this case it occurred during the first but no later than the second trimester, not at the birth of the child. Accordingly, the statute of limitations would have run even if the word "occurrence" in 5–219(4) refers to the damage to Mrs. Blake and not the act of the doctor.

It is true that Mrs. Blake did not know that the doctor allegedly deprived her of her right to an abortion until after the child was born. However, to start the statute running when she gained knowledge of the doctor's misdiagnosis is to merely reinstate the "discovery rule" of *Renner v. Edwards.* In that case Justice Shepard said, "To adopt the 'discovery rule' is to imply the existence of knowledge as a requirement for the accrual of an action and thus supply knowledge as a statutory requirement." As this Court stated in three subsequent cases, the legislature intended to change the *Renner* discovery rule by the 1971 amendment to I.C. § 5–219(4). I.C. § 5–219(4), which states that "professional malpractice ... shall be deemed to have accrued as of the time of the occurrence, act or omission complained of," refers to the conduct of the doctor, not to the time when the claimant was deprived of her right to an abortion. But even if it did, the claimant in this case was at best deprived of her right to an abortion only for a three or six-month period from the beginning of her pregnancy. It did not occur at the "birth of a defective child" since the doctor had nothing to do with either the conception or the defect in the child, and he could have done nothing to prevent the defect. Thus, even under the majority's interpretation of the word "occurrence," the statute of limitations has run in this case and the district court correctly dismissed the complaint.

## II.

I am also troubled by that part of the majority opinion relating to the claim of wrongful birth. It is necessary to distinguish those cases where the professional health care provider has caused the injury to the fetus as a result of some treatment or lack of treatment while in his professional care, and cases, such as this case, where the doctor had nothing to do with the injury or illness and could not have helped or cured it by treatment, but allegedly failed

to diagnose the condition and advise the parents so that they could make an informed decision on whether or not to have the fetus aborted. I have serious reservations about recognizing a cause of action which imposes liability upon a medical professional in this circumstance. Such a cause of action is premised upon an assumption that the parents would have aborted the fetus had they known of the defects which they, rather than the doctor, were responsible for. Some states have recognized such a cause of action, as the majority opinion points out. In order to prove such a claim, these parents would have the affirmative burden of convincing a jury that they would have aborted the fetus rather than run the risk that it might be born with some defects resulting from the mother's having contracted rubella. I seriously question whether juries can, and indeed should be required to make such a determination.

However, a majority of the Court has concluded that such a cause of action is permissible and that the appropriate measure of damages should be the "extraordinary expenses, medical, custodial and otherwise necessitated by the child's condition from birth to [its] estimated life expectancy ...." *Ante* at 320. The majority would also allow the Blakes to recover damages for emotional distress. In reaching this conclusion, the majority acknowledges that "[g]rief and anguish are not allowable elements of recovery." I fail to see a meaningful distinction between emotional distress and "grief and anguish." In fact, case law appears to use the terms interchangeably. *Compare Hepp v. Ader*, 64 Idaho 240, 245, 130 P.2d 859, 862 (1942) (*citing Wyland v. Twin Falls Canal Co.*, 48 Idaho 789, 285 P. 676 (1930), for the proposition that recovery for grief and anguish is not available) *with Wyland v. Twin Falls Canal Co., supra* at 796, 285 P. at 678 (damages for mental suffering not available).

Idaho has long adhered to the position that damages for emotional distress are not awarded in wrongful death actions. *See Volk v. Baldazo*, 103 Idaho 570, 573, 651 P.2d 11, 14 (1982); *Hooton v. City of Burley*, 70 Idaho 369, 379, 219 P.2d 651, 657 (1950); *Wyland v. Twin Falls Canal Co.*, 48 Idaho 789, 798, 285 P. 676, 678 (1930). Damages for emotional distress are likewise not awarded in actions seeking to recover for injury to a child. *Hayward v. Yost*, 72 Idaho 415, 427, 242 P.2d 971, 978 (1952). Although I question whether "wrongful birth" is analogous to cases dealing with parents who seek recovery for death or injury of a child, it is clear that the majority is in error in suggesting that those cases are precedent for allowing damages for emotional distress in wrongful birth cases.

### III.

Finally, I concur in that part of the majority opinion which rejects the so-called wrongful life cause of action on behalf of the child. To allow such a cause of action would be inconsistent with the legal premise behind the parents' wrongful birth cause of action. The parents' cause of action is based upon their sworn claim that had Dr. Cruz correctly diagnosed Mrs. Blake's rubella condition, they would have taken the life of their fetal-child by obtaining an abortion. If the fetal-child which Mrs. Blake was carrying has no legal right or protection from such an intentional aborting act of her mother, a decision which apparently Mrs. Blake claims the right to make with impunity and immunity, upon what legal basis and upon what set of values can the doctor's negligent misdiagnosis of the mother's condition create a cause of action in the fetal-child? In our law an intentional act has always been considered more serious conduct than a mere negligent act. The so-called wrongful life cause of action in this case would reverse that longstanding policy of the law.

To state that the same negligent misdiagnosis, which created a cause of action in the parents because it prevented them from taking the life of their fetal-child, also created a cause of action in the child be-

cause it bestowed upon the child the gift of life, would be the ultimate incongruity.

ON PETITION FOR REHEARING

HUNTLEY, Justice.

The petition for rehearing in the above entitled action was granted and reargued. The Court has reviewed the record, considered the arguments presented by counsel, and we continue to adhere to the views expressed and the conclusion reached in our earlier opinion.

.

DONALDSON, C.J., and SHEPARD and BISTLINE, JJ., concur.

BAKES, J., continues to adhere to the views expressed in his dissent and BISTLINE, J., continues to adhere to the views expressed in his dissent as to Part II.