332 S.E.2d 872

**JAMES G. and Lurana G.**

v.

**Larry CASERTA, M.D.**

**JENNIFER S., a minor, etc., et al.**

v.

**Amnath KIRDNUAL, M.D.**

Nos. CC944, 16426.

Supreme Court of Appeals of West Virginia.

July 11, 1985.

of parents and their children to recover damages against health care providers for what are commonly called wrongful pregnancy, wrongful birth, and wrongful life causes of action.[1]

The first case comes by way of certified questions from a federal district court and involves parents seeking to recover damages resulting from an alleged negligently performed tubal ligation. The wife subsequently became pregnant and delivered a healthy child. In the second case, the parents claim that the physician failed to perform an amniocentesis test on the wife, which would have revealed that the child had a birth defect. Both the parents and the child seek to recover damages in this case.

Paul A. Ryker, Huntington, for appellants James G. and Lurana G.

Wood, Grimm & Delp, John F. Wood, Jr., Robert M. Losey, Huntington, for appellee Caserta.

Charles S. Morrow, Pittsburgh, Pa., Kenneth E. Kincaid, Morgantown, for appellants Jennifer S. et al.

Steptoe & Johnson, Herbert G. Underwood, Irene M. Keeley, Clarksburg, for appellee Kirdnual.

MILLER, Chief Justice:

These two cases have been consolidated for purposes of this opinion as they involve interrelated issues dealing with the rights

## I.

### A.

The first of the two certified questions from the United States District Court for the Southern District of West Virginia, pursuant to W.Va.Code, 51–1A–1,[2] asks whether a cause of action for wrongful birth is recognized in West Virginia.[3] If we answer the first question in the affirmative, then the second question is what damages may be recovered in such an action.

 Courts have devised several terms to describe causes of action involving a physician's negligence that results in unplanned pregnancies or births. Some courts make a distinction between wrong-

---

1. We have styled this case by using the first names and last initials of the plaintiffs to protect their identities. Because of the emotional, moral, and philosophical implications inherent in wrongful pregnancy, wrongful birth, and wrongful life cases, we feel that this procedure will prevent the plaintiffs from being subject to any undue publicity and will help to preserve the sanctity of the families involved. *Cf. J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978).

2. Under W.Va.Code, 51–1A–1, this Court has the discretion to answer questions of law certified to us by "the Supreme Court of the United States, a court of appeals of the United States, a United States district court or the highest appellate court or the intermediate appellate court of any other state." This procedure is used when there is no controlling State precedent on the issue certified. *See, e.g., Flannery v. United States*, 171 W.Va. 27, 297 S.E.2d 433, 34 A.L.R.4th 281 (1982); *Abrams v. West Virginia Racing Comm'n.*, 164 W.Va. 315, 263 S.E.2d 103 (1980); *Morningstar v. Black & Decker Mfg. Co.*, 162 W.Va. 857, 253 S.E.2d 666 (1979).

3. We note that a case which is factually similar to the present one was decided by the United States District Court for the Southern District of West Virginia in *Bishop v. Byrne*, 265 F.Supp. 460 (S.D.W.Va.1967). There, a negligent tubal ligation resulted in the birth of a healthy child. The court, without using the terms wrongful pregnancy or wrongful birth, held that the complaint stated a valid cause of action under West Virginia's law of negligence. It did not discuss the damage issue.

ful birth and wrongful pregnancy, also referred to as wrongful conception. According to these courts, wrongful birth is an action brought by the parents of a child born with birth defects while wrongful pregnancy is an action brought by the parents of a child born healthy. *See Fulton-DeKalb Hosp. Auth. v. Graves*, 252 Ga. 441, 314 S.E.2d 653 (1984); *Blake v. Cruz*, 698 P.2d 315 (Idaho 1984); *Nanke v. Napier*, 346 N.W.2d 520 (Iowa 1984); *Kingsbury v. Smith*, 122 N.H. 237, 442 A.2d 1003 (1982); Handling Pregnancy & Birth Cases §§ 3.8, 6.1 (1983); Annot., 83 A.L.R.3d 15 (1978).[4] We believe that there are material distinctions in the underlying causes of action and in the amount of damages that can be recovered by the parents in the two situations.[5] We will use the term "wrongful pregnancy" for those cases where a failed sterilization procedure has resulted in the birth of a healthy child. The term "wrongful birth" applies to those cases where the child is born with a birth defect. *See* Part II, *infra*. Therefore, even though the certified questions use the term "wrongful birth," we will answer the questions with regard to a wrongful pregnancy action, which we believe is more appropriate in the present case.

■ The liability theory in the most common wrongful pregnancy action is the parents' claim that the physician was negligent in performing a sterilization procedure and as a consequence the parents conceived a child for whom they had not planned and seek to recover hospital, medical, and other related expenses attendant to the birth of the child. As we explain in greater detail in Part II, the usual theory in a wrongful birth claim is not that the parents did not desire to have a child initially and, thereby, underwent sterilization procedures. Rather, the legal theory is based on the fact that the physician failed to advise the parents of the existence of a condition indicating that their child may have birth defects. This failure to advise prevented the parents from making an informed decision with regard to not conceiving a child or, in the event of a pregnancy, to terminate the same.

The facts involved in the underlying civil suit can be summarized briefly. The plaintiffs, husband and wife, decided that to avoid having any more children, the wife would undergo a tubal ligation operation, which was performed by Dr. Larry Caserta on January 8, 1981. In August of 1981, the plaintiffs were informed that the wife was pregnant and in February of 1982, she

---

**4.** This area of the law as well as the companion theory of wrongful life discussed in Part II, *infra*, has drawn the attention of numerous legal commentators. *E.g.*, Capron, *Tort Liability in Genetic Counseling*, 79 Colum.L.Rev. 618 (1979); Collins, *An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death, and Wrongful Birth: Time for a New Framework*, 22 J.Fam.L. 677 (1983–84); Rogers, *Wrongful Life and Wrongful Birth: Medical Malpractice in Genetic Counseling and Prenatal Testing*, 33 S.C.L.Rev. 713 (1982); Scheid, *Benefits vs. Burdens: The Limitation of Damages in Wrongful Birth*, 23 J.Fam.L. 57 (1984–85); Comment, *Wrongful Life: A Tort Resuscitated*, 7 Am.J.Trial Advoc. 167 (1983); Comment, *Damages for the Wrongful Birth of Healthy Babies*, 21 Duq.L.Rev. 605 (1983); Comment, *Recovery of Childrearing Expenses in Wrongful Birth Cases: A Motivational Analysis*, 32 Emory L.J. 1167 (1983); Comment, *Wrongful Birth and Wrongful Life: Questions of Public Policy*, 28 Loy.L.Rev. 77 (1982); Comment, *Wrongful Life: The Tort That Nobody Wants*, 23 Santa Clara L.Rev. 847 (1983); Comment, *The Trend Toward Judicial Recognition of Wrongful Life: A Dissenting View*, 31 U.C.L.A.L.Rev. 473 (1983); Comment, *Wrongful Life: A Legislative Solution to Negligent Genetic Counseling*, 18 U.S.F.L.Rev. 77 (1983); Note, *Boone v. Mullendore: Confusion of Actions in Wrongful Life, Wrongful Birth, and Wrongful Pregnancy*, 35 Ala.L.Rev. 179 (1984); Note, *Wrongful Birth: Fact Patterns Giving Rise to Causes of Action Distinguished and Discussed*, 4 Hamline L.Rev. 59 (1980); Note, *Wrongful Life: A Finally Recognized Tort*, 8 J.Juv.L. 127 (1984); Note, *Trends in Recognition of Future Child Rearing Expenses in Wrongful Conception Actions*, 8 J.Juv.L. 178 (1984); Note, *Damages for Wrongful Birth and Wrongful Pregnancy in Illinois*, 15 Loy.U.Chi.L.J. 799 (1984); Note, *Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant*, 68 Va.L.Rev. 1311 (1982).

**5.** We note that several courts do not make any distinction between a wrongful pregnancy and a wrongful birth action. As a result, what we would refer to as a wrongful pregnancy case is sometimes labeled a wrongful birth action in other states. Therefore, in citing authority from other jurisdictions, we will use both terms.

gave birth to a healthy child. Subsequently, the plaintiffs filed this civil action against Dr. Caserta for the alleged negligently performed tubal ligation.

We emphasize that we are concerned only with the two certified questions presented and do not address the liability of the defendant physician. The certified questions, in effect, ask us to assume that there is proof of malpractice in order to determine whether we recognize the cause of action.

An overwhelming majority of other jurisdictions have recognized a cause of action for wrongful pregnancy or wrongful birth.[6] The usual analysis applied in these cases is that if the physician has negligently performed the sterilization operation, he has breached his duty to his patient. From a proximate cause standpoint, it is foreseeable that as a result of this negligence, another child will be born and the parents will incur damages as a result of the medical and hospital costs associated with the birth of the child as well as other damages. The Supreme Court of Alabama summarized this approach in *Boone v. Mullendore*, 416 So.2d 718, 720 (Ala.1982):

"[I]n order to state a cause of action for negligence, the plaintiff must show that the defendant has a legal duty, that the defendant has breached that duty, that the defendant's breach proximately caused an injury, and that damages have resulted to the plaintiff.... It is also the law in Alabama that a physician owes a duty to exercise reasonable care in the treatment of his or her patients.... Therefore, if proven, the negligent misrepresentation of the nature of the sur-

gery and/or such negligent performance of that surgery as would wrongfully cause a patient to become pregnant would be a breach of that duty." (Citations omitted).

This follows our general law regarding proof of malpractice as set out in Syllabus Point 1 of *Hinkle v. Martin*, 163 W.Va. 482, 256 S.E.2d 768 (1979):

" 'In an action for damages against a physician for negligence or want of skill in the treatment of an injury or disease, the burden is. on the plaintiff to prove such negligence or want of skill and that it resulted in injury to the plaintiff.' Point 4, Syllabus, *Hundley v. Martinez*, 151 W.Va. 977 [158 S.E.2d 159] (1967)."

*See also* Syllabus Point 1, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964); Syllabus, *White v. Moore*, 134 W.Va. 806, 62 S.E.2d 122 (1950).

In light of the authority from other jurisdictions and our medical malpractice cases, we conclude that an action based on wrongful pregnancy is recognized in this State, and, therefore, answer the first certified question in the affirmative.

### B.

The second certified question requests that we specify the damages that are recoverable in a wrongful pregnancy action. The plaintiffs seek recovery for the medical expenses attributable to the original tubal ligation, prenatal care, childbirth, postnatal care, and the cost of a subsequent tubal ligation. In addition to these pecuniary damages, the plaintiffs seek damages to compensate the wife's physical and mental

---

**6.** *See Boone v. Mullendore*, 416 So.2d 718 (Ala. 1982); *University of Arizona Health Sciences Center v. Superior Court*, 136 Ariz. 579, 667 P.2d 1294 (1983) (En Banc); *Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568 (1982); *Turpin v. Sortini*, 31 Cal.3d 220, 643 P.2d 954, 182 Cal.Rptr. 337 (1982) (In Bank); *Ochs v. Borrelli*, 187 Conn. 253, 445 A.2d 883 (1982); *Fassoulas v. Ramey*, 450 So.2d 822 (Fla.1984); *Fulton-DeKalb Hosp. Auth. v. Graves, supra; Blake v. Cruz, supra; Byrd v. Wesley Medical Center*, 237 Kan. 215, 699 P.2d 459 (1985); *Schork v. Huber*, 648 S.W.2d 861 (Ky.1983); *Jones v. Malinowski*, 299 Md. 257, 473 A.2d 429 (1984); *Troppi v. Scarf*, 31 Mich.App. 240, 187 N.W.2d 511 (1971); *Sher-*

*lock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn. 1977); *Miller v. Duhart*, 637 S.W.2d 183 (Mo. App.1982); *Kingsbury v. Smith, supra; Schroeder v. Perkel*, 87 N.J. 53, 432 A.2d 834 (1981); *Bowman v. Davis*, 48 Ohio St.2d 41, 356 N.E.2d 496, 2 O.O.3d 133 (1976); *Speck v. Finegold*, 497 Pa. 77, 439 A.2d 110 (1981); *Jacobs v. Theimer*, 519 S.W.2d 846 (Tex.1975); *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825 (1982); *McKernan v. Aasheim*, 102 Wash.2d 411, 687 P.2d 850 (1984) (En Banc); *Dumer v. St. Michael's Hosp.*, 69 Wis.2d 766, 233 N.W.2d 372, 83 A.L.R.3d 1 (1975); *Beardsley v. Wierdsma*, 650 P.2d 288 (Wyo.1982).

pain and suffering resulting from the pregnancy and the sterilization operations, and the loss of consortium. A final claim is for the anticipated costs of rearing and educating their healthy child.

A majority of the courts that have examined the damage issue in a wrongful pregnancy context have ruled that most of the above-listed damages are recoverable except child-rearing costs for a healthy child. *See Boone v. Mullendore, supra; Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568 (1982); *Fassoulas v. Ramey*, 450 So.2d 822 (Fla.1984); *Fulton-DeKalb Hosp. Auth. v. Graves, supra; Blake v. Cruz, supra; Sherlock v. Stillwater Clinic*, 260 N.W.2d 169 (Minn.1977); *Miller v. Duhart*, 637 S.W.2d 183 (Mo.App.1982); *Kingsbury v. Smith, supra; Mason v. Western Pennsylvania Hosp.*, 499 Pa. 484, 453 A.2d 974 (1982); *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825 (1982); *McKernan v. Aasheim*, 102 Wash.2d 411, 687 P.2d 850 (1984) (En Banc); *Beardsley v. Wierdsma*, 650 P.2d 288 (Wyo.1982). The awarding of these damages is compatible with our cases regarding the recovery of damages in negligence actions.

In *Flannery v. United States*, 171 W.Va. 27, 29, 297 S.E.2d 433, 435, 34 A.L.R.4th 281, 284 (1982), we noted that "[t]he basic goal in awarding damages is to fairly and adequately compensate the plaintiff for the injuries and losses sustained." *See generally* Syllabus Point 3, *Perkins v. Monongahela Valley Traction Co.*, 81 W.Va. 781, 95 S.E. 797 (1918); *Yates v. Crozer Coal & Coke Co.*, 76 W.Va. 50, 84 S.E. 626 (1915); Syllabus Point 1, *Talbott v. West Virginia C. & P. Ry. Co.*, 42 W.Va. 560, 26 S.E. 311 (1896). In the medical malpractice area, we stated in Syllabus Point 2 of *Thornton v. Charleston Area Medical Center*, 158 W.Va. 504, 213 S.E.2d 102 (1975): "If an injured person uses ordinary care in selecting a physician or hospital, then the law regards an injury resulting from the negligence of the physician or hospital as a part of the immediate and direct damages which naturally flow from the original injury."

In applying our general rules governing damages to a wrongful pregnancy action, we conclude that the following damages are recoverable, if proven: (1) any medical and hospital expenses incurred as a result of a physician's negligence, including costs of the initial unsuccessful sterilization operation, prenatal care, childbirth,[7] postnatal care, and a second sterilization operation, if obtained;[8] (2) the physical and mental pain suffered by the wife as a result of the pregnancy and subsequent childbirth and as a result of undergoing two sterilization operations;[9] and (3) recovery for the loss of consortium and loss of wages.[10]

The most difficult issue in this area is whether damages may be recovered in a wrongful pregnancy action for the ordinary costs of raising a healthy child. The theory behind this damage claim is that if it were not for the negligence of the physician in performing the sterilization operation, the subsequent pregnancy and resulting birth would not have occurred. Therefore, it is argued that since the physician's negligence resulted in the birth of an unplanned child, he should be required to pay for the ordinary costs of rearing and educating the child until the child reaches the age of majority or until the parents' obligation to support the child ceases.

The courts that have addressed this issue have been rather unanimous in holding that the ordinary child-rearing expenses for a healthy child cannot be recovered in an action for wrongful pregnancy or wrongful

7. If the parents choose to terminate the unplanned pregnancy, the costs of such an operation would also be recoverable. *Beardsley v. Wierdsma, supra.*

8. *Cf.* Syllabus Points 14 and 16, *Long v. City of Weirton*, 158 W.Va. 741, 214 S.E.2d 832 (1975) (rules for the recovery of medical and out-of-pocket expenses stated).

9. *Cf. Crum v. Ward*, 146 W.Va. 421, 122 S.E.2d 18 (1961) (pain and suffering damages discussed).

10. *Cf. King v. Bittinger*, 160 W.Va. 129, 231 S.E.2d 239 (1976) (recovery for loss of consortium examined); *Ellard v. Harvey*, 159 W.Va. 871, 231 S.E.2d 339 (1976) (claim for loss of wages analyzed).

birth. *See Boone v. Mullendore, supra; Wilbur v. Kerr, supra; Fassoulas v. Ramey, supra; Fulton-DeKalb Hosp. Auth. v. Graves, supra; Nanke v. Napier, supra; Byrd v. Wesley Medical Center, supra; Schork v. Huber, supra; Sherlock v. Stillwater Clinic, supra; Kingsbury v. Smith, supra; Mason v. Western Pennsylvania Hosp., supra; McKernan v. Aasheim, supra; Beardsley v. Wierdsma, supra.* These courts refuse to recognize this element of damages generally because it would be too speculative or would violate some public policy.

A minority of courts have adopted what is referred to as the benefits rule which allows parents to recover the ordinary costs of child rearing offset by the benefits the parents will receive from having the child. *University of Arizona Health Sciences Center v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294 (1983) (En Banc); *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal. Rptr. 652 (1976); *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984); *Troppi v. Scarf, supra; Sherlock v. Stillwater Clinic, supra.*

The Supreme Court of Kansas in *Byrd,* 699 P.2d at 465, summarized the various reasons underlying the majority view which denies recovery of ordinary child-rearing costs for a healthy child in a wrongful pregnancy or wrongful birth action:

> "(1) A parent cannot be said to have been damaged by the birth and rearing of a normal and healthy child.
>
> (2) Benefits of joy, companionship, and affection which a healthy child can provide outweigh the costs of rearing that child.
>
> (3) The recovery of rearing costs would be a windfall to the parents and an un-

reasonable burden on the negligent health care provider, wholly out of proportion to the culpability of the physician.

> (4) Recovery should be denied to protect the mental and emotional health of the child, sometimes described as an 'emotional bastard,' who will one day learn that he or she not only was not wanted by his or her parents, but was reared by funds supplied by another person.
>
> (5) Other reasons include the speculative nature of damages and the possibility of fraudulent claims."

■ We are not persuaded by all of these enumerated reasons in support of the majority view nor do we accept the arguments in favor of the benefits rule. It is clear from examining the cases that the issue does not lend itself to a simple solution. We concur with the Supreme Court of Washington, which extensively discusses this issue in *McKernan*, where it concluded that the main problem with awarding damages for ordinary child-rearing expenses is in attempting to project the future emotional and other benefits that might be derived from having the healthy child.[11] As a consequence, it declined to award the cost of child-rearing expenses because the damages were too speculative. Our rule on establishing future damages is stated in Syllabus Point 7 of *Jordan v. Bero,* 158 W.Va. 28, 210 S.E.2d 618 (1974):

> "To form a legal basis for recovery of future permanent consequences of the negligent infliction of a personal injury, it must appear with reasonable certainty that such consequences will result from the injury; contingent or merely possible future injurious effects are too remote and speculative to support a lawful recovery."

11. In *McKernan,* 102 Wash.2d at 419–20, 687 P.2d at 855, the court states:

> "We believe that it is impossible to establish with reasonable certainty whether the birth of a particular healthy, normal child damaged its parents. Perhaps the costs of rearing and educating the child could be determined through use of actuarial tables or similar economic information. But whether these costs are outweighed by the emotional benefits which will be conferred by that child cannot be calculated. The child may turn out to be loving, obedient and attentive, or hostile, unruly and callous. The child may grow up to be President of the United States, or to be an infamous criminal. In short, it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain."

We find that this rule stated in *Jordan* is applicable and conclude that in accordance with the majority of jurisdictions, the ordinary costs of raising a healthy child cannot be recovered in a wrongful pregnancy action.[12]

## II.

In this second malpractice case, which involves genetic counseling, we are asked to consider the propriety of the trial court's action in dismissing the wrongful life claim brought by the parents on behalf of their child born with Down's syndrome and in directing a verdict in favor of the defendant physician on the wrongful birth action brought by the parents. They contend their child's condition would have been discovered during the pregnancy if the physician had performed a prenatal test known as amniocentesis. The parents sought as next friend of their child to recover damages on her behalf for her birth defects, which action is known as a wrongful life action.

The parents also brought a wrongful birth action based on the same negligence, which the trial court dismissed based on the fact that they had failed to prove any recoverable damages. The parents sought to recover expenses for the extraordinary costs of caring for their child once she reached the age of majority. The trial court held that once the child reached the age of majority, the parents were not liable for her support.[13]

### A.

■ The question of whether a child who is born with birth defects has a cause of action against the mother's attending physician is a question of first impression in this jurisdiction. Such a claim is generally labeled by courts as a claim for "wrongful life." In a related vein, a claim for wrongful birth is that asserted by the parents of a child who is born with a birth defect that causes him to be handicapped. The underlying theory for both causes of action is that the physician or other health care provider failed to discover the birth defect and to advise the parents so that they could intelligently decide whether to forebear having the child or, after the mother has become pregnant, to consider the termination of the pregnancy.

This area of the tort law has evolved as a result of the increased ability of medical science to determine the possibility of genetic defects which can cause substantial birth defects in children. With the increased knowledge in this field of genetic counseling, there is the concomitant recognition that the ordinary standard of care may require appropriate tests and counseling with parents who are more likely to bear children with birth defects.

Preliminarily, we note that a wrongful life theory differs from those cases where the negligence directly causes the death of a viable unborn child. We, along with a majority of other jurisdictions, have recognized that where injury or death has occurred as a result of the negligent act of another, the child may recover. *Baldwin v. Butcher*, 155 W.Va. 431, 184 S.E.2d 428 (1971); Annot., 99 A.L.R.2d 1398 (1965).[14]

**12.** Where the child is born with birth defects, the rule is that the costs of correcting the defects and the costs of extraordinary child care arising from the defects are recoverable in a wrongful birth action. *See* Part II(B), *infra*.

**13.** The circuit court did not dismiss the parents' wrongful birth action apparently on the belief that they had established sufficient evidence to carry the negligence issue to the jury. The court ruled that no damages were proven as a matter of law. The liability issue is, therefore, not before us.

**14.** Several courts have extended prenatal torts to events that preceded conception where it was shown that a negligent act created a condition in the mother which directly caused the child's birth defect. *Jorgensen v. Meade Johnson Laboratories, Inc.*, 483 F.2d 237 (10th Cir.1973) (applying Oklahoma law) (birth control pills taken before pregnancy caused mother to deliver twins with birth defects); *Bergstreser v. Mitchell*, 577 F.2d 22 (8th Cir.1978) (applying Missouri law) (in a previous delivery, mother's uterus was ruptured by physician's negligence which created a difficult delivery and permanent injuries to a subsequent child); *Renslow v. Mennonite Hosp.*, 67 Ill.2d 348, 10 Ill.Dec. 484, 367 N.E.2d 1250, 91 A.L.R.3d 291 (1977) (before conception, mother was given an improper blood transfusion which subsequently caused child's birth defect); *Seattle-First National Bank*

Wrongful life theory is not predicated on the fact that the physician caused any direct injury to the unborn child.

In the present case, however, we are not confronted with a claim that the physician's negligence caused the child's birth defect. Rather, the claim is made on behalf of the child that the physician failed to perform an amniocentesis test,[15] which would have revealed the birth defect. At this point, the parents assert that a eugenic termination of the mother's pregnancy could have occurred and the child would not have been born with the birth defect.

Courts have had difficulty in determining the legal basis for such a child's cause of action. The issue is usually framed in terms of the child's action being a claim that he has a right not to be born with such a birth defect. His right not to be born, however, is traced to his mother's right to terminate the pregnancy. This right is said to have been denied by the physician who failed to make the diagnostic test which would have revealed the birth defect.

The Supreme Courts of California, New Jersey, and Washington have recognized a child's cause of action to sue for wrongful life, but have limited the child's damages to the cost of the extraordinary care brought about by the birth defects. *Turpin v. Sortini,* 31 Cal.3d 220, 643 P.2d 954, 182 Cal. Rptr. 337 (1982) (In Bank); *Procanik v. Cillo,* 97 N.J. 339, 478 A.2d 755 (1984); *Harbeson v. Parke-Davis, Inc.,* 98 Wash.2d 460, 656 P.2d 483 (1983) (En Banc). In

each case, the courts permitted the parents to recover the extraordinary care costs during the child's minority on a wrongful birth theory. The child was then permitted to recover the same costs after reaching the age of majority on a wrongful life theory or during his minority if the parents had not previously recovered such costs in a wrongful birth action. The rationale adopted by these courts for a wrongful life theory rests not on a traditional tort analysis of the child's cause of action, but rather on the theory that it is illogical to give relief to the parents on a wrongful birth theory and not to the child in a wrongful life claim.[16]

A majority of other courts have refused to recognize a cause of action for wrongful life by a child born with birth defects. *See, e.g., Elliott v. Brown,* 361 So.2d 546 (Ala. 1978); *Moores v. Lucas,* 405 So.2d 1022 (Fla.Dist.Ct.App.1981); *Blake v. Cruz, supra; Eisbrenner v. Stanley,* 106 Mich.App. 357, 308 N.W.2d 209 (1981); *Miller v. Duhart, supra; Speck v. Finegold,* 497 Pa. 77, 439 A.2d 110 (1981) (evenly divided court affirming); *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984); *Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 233 N.W.2d 372, 83 A.L.R.3d 1 (1975); *Beardsley v. Wierdsma, supra.*

Despite some factual relationship to the parents' wrongful birth claim, we do not believe that the child's wrongful life claim can be carried under the usual tort analysis [17] as can the parents' wrongful birth

---

*v. Rankin,* 59 Wash.2d 288, 367 P.2d 835 (1962) (En Banc) (physician failed to diagnose mother's correctable anemia and was negligent in delivering child who was consequently born with cerebral palsy). *See* Annot., 91 A.L.R.3d 316 (1979).

**15.** Amniocentesis is defined in Dorland's Illustrated Medical Dictionary 70 (25th ed. 1974), as a "surgical transabdominal perforation of the uterus to obtain amniotic fluid." It is by analyzing this fluid that the potential for certain birth defects can be discovered.

**16.** In *Procanik,* 97 N.J. at 351–52, 478 A.2d at 762, the New Jersey Supreme Court concluded: "Whatever logic inheres in permitting parents to recover for the cost of extraordinary medical care incurred by a birth-defective child, but in denying the child's own right to recover those

expenses, must yield to the injustice of that result."

**17.** Our traditional analysis of a negligence action was reviewed at some length in *Robertson v. LeMaster,* 171 W.Va. 607, 301 S.E.2d 563, 566 (1983), where we began by quoting from Syllabus Point 1 of *Parsley v. General Motors Acceptance Corp.,* 167 W.Va. 866, 280 S.E.2d 703 (1981): "In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken."

We also spoke of the question of foreseeability of harm as an important element in determining the existence of a duty and quoted from *Matthews v. Cumberland & Allegheny Gas Co.,* 138 W.Va. 639, 653, 77 S.E.2d 180, 188 (1953),

claim. In this latter claim, liability rests on the physician's failure to initially diagnose the birth defect. The underlying premise is that prudent medical care would have disclosed the possibility of birth defects either prior to conception or during pregnancy. As a proximate result of this diagnostic failure, the parents were precluded from making an informed decision to either prevent conception or to make a subsequent informed decision to terminate the pregnancy. Within this same ambit of proximate cause is the foreseeability on the part of the physician that the child will be born with birth defects.

■ Such an analysis cannot be made of the child's wrongful life claim. One of the underlying premises in this area of the law is that the birth defect is not curable while the child is in the fetal stage. Consequently, the physician is not being charged with the failure to cure the birth defect, but rather with the failure to give the parents information about it so that an informed choice could be made. This duty to inform does not extend to the unborn child as it is the parents' decision to risk conception or to terminate a pregnancy. We, therefore, conclude that in this jurisdiction, a claim for wrongful life does not exist in the absence of any statute giving rise to such a cause of action.

A number of those courts that have declined to find a wrongful life cause of action have done so not so much on an extensive analysis of why the cause of action does not exist, but rather on the difficulty of computing general damages for the handicapped child. *E.g., Elliott v. Brown, supra; Blake v. Cruz, supra; Dumer v. St. Michael's Hosp., supra.* In these cases, the courts discuss the possibility of damages for pain, suffering, humiliation, disfiguration, and incapacity to work resulting from the birth defect. The rejection of these damages turns on the thought that because the cause of action for wrongful life is labeled as a right not to be born, any general damages would be an attempt to measure nonlife against a life with birth defects.[18] Because we have rejected the wrongful life theory on the fact that it cannot withstand a rational tort theory analysis, we decline to discuss the damage aspects.

Although we have rejected the wrongful life theory on behalf of the child, as we point out in the next section, the parents' claim for wrongful birth is not limited to the extraordinary child care costs during the child's minority. They may also recover in the appropriate case such costs during the child's majority.

## B.

As we have earlier noted, the court ruled at the conclusion of the trial that the par-

---

that "[a]ctionable negligence necessarily includes the element of reasonable anticipation that some injury might result from the act of which complaint is made."

· A final component is that the negligence must be the proximate cause of the injury or, as we said in Syllabus Point 4 of *Miller v. Bolyard,* 142 W.Va. 580, 97 S.E.2d 58 (1957): " 'Foreseeable injury is a requisite of proximate cause, and proximate cause is a requisite for actionable negligence, and actionable negligence is a requisite for recovery in an action for personal injury negligently inflicted.' Point 7, Syllabus, *Puffer v. The Hub Cigar Store, Inc.,* 140 W.Va. 327 [84 S.E.2d 145 (1954) ]."

These rules do not differ because the claim is one for medical malpractice. *See Hundley v. Martinez,* 151 W.Va. 977, 158 S.E.2d 159 (1967); *Schroeder v. Adkins,* 149 W.Va. 400, 141 S.E.2d 352 (1965).

**18.** This theory has evolved from this frequently quoted passage from Chief Justice Weintraub in his partial dissent in *Gleitman v. Cosgrove,* 49 N.J. 22, 63, 227 A.2d 689, 711, 22 A.L.R.3d 1411, 1438–39 (1967):

"Ultimately, the infant's complaint is that he would be better off not to have been born. Man, who knows nothing of death or nothingness, cannot possibly know whether that is so.

"We must remember that the choice is not between being born with health or being born without it; it is not claimed the defendants failed to do something to prevent or reduce the ravages of rubella. Rather the choice is between a worldly existence and none at all. Implicit, beyond this claim against a physician for faulty advice, is the proposition that a pregnant woman who, duly informed, does not seek an abortion, and all who urge her to see the pregnancy through, are guilty of wrongful injury to the fetus, and indeed that every day in which the infant is sustained after birth is a day of wrong. To recognize a right not to be born is to enter an area in which no one could find his way."

ents had not shown any damages under their theory of wrongful birth. The parents sought damages for the extraordinary costs of raising the child after she reached the age of majority. The circuit court held that the parents could not recover these expenses after the child reached the age of majority. The court, in directing the verdict for the defendant, also held that the plaintiffs had failed to prove any damages for the extraordinary expenses needed to raise their child during her minority.

■ The failure of a physician to discover a birth defect and to advise the parents of its consequences will give rise to a cause of action on their behalf for the extraordinary expenses incurred as a result of the child being born with such birth defect. In this situation, the negligence based on a duty owed to furnish reasonable medical care and to advise the parents of the possibility of birth defects can be demonstrated. We conclude, as have a majority of other jurisdictions, that a cause of action for wrongful birth is recognized in this State.[19]

It is generally recognized that in a wrongful birth action, parents may recover the extraordinary costs necessary to treat the birth defect and any additional medical or educational costs attributable to the birth defect during the child's minority. *See Turpin v. Sortini, supra; Fassoulas v. Ramey, supra; Blake v. Cruz, supra; Schroeder v. Perkel,* 87 N.J. 53, 432 A.2d 834 (1981); *Becker v. Schwartz,* 46 N.Y.2d 401, 386 N.E.2d 807, 413 N.Y.S.2d 895 (1978); *Jacobs v. Theimer, supra; Naccash v. Burger, supra; Harbeson v. Parke-Davis, Inc., supra; Dumer v. St. Michael's Hosp., supra.*

Several courts have permitted parents to recover in their wrongful birth action the extraordinary costs incurred as a result of the child's birth defects after the child has reached the age of majority. These courts

have based this holding on the theory that under the common law where a child is incapable of supporting himself because of physical or emotional disabilities, the parents' obligation to support continues beyond the child's age of majority. *E.g., Phillips v. United States,* 575 F.Supp. 1309 (D.S.C.1983); *Blake v. Cruz, supra.*[20] The court in *Blake,* 698 P.2d at 321, after first acknowledging the general common law rule that parents are not required to support a child who has reached the age of majority or is otherwise emancipated, quoted the following statement from *Lieberman v. Lieberman,* 517 S.W.2d 478, 480 (Mo.App.1974):

" 'A recognized exception occurs where the adult child is unmarried, unemancipated and insolvent and physically or mentally incapacitated from supporting himself. *Fower v. Fower Estate,* 448 S.W.2d 585 (Mo.1970). The parental duty of support in such cases may continue past chronological majority when, because of physical or mental infirmity, the child is unable to provide for his support and undertake the responsibilities normally associated with his age. The duty on the parent to provide post-majority support arises not from the nature of the support or benefits sought, but from the condition of the child seeking the benefit.' "

We find this reasoning to be rational and compelling. Parents should not be forced to pay extraordinary expenses resulting from a child born with birth defects occasioned by the physician's failure to provide reasonable genetic counseling. The parents will not be made whole by permitting a recovery for these damages only for the minority of the child, when it can be shown that the child will not be self-sufficient once the age of majority is reached.

---

**19.** See cases cited in note 6, *supra.*

**20.** The following cases deal generally with the rule that parents are required to support a disabled child beyond his age of majority. *Fincham v. Levin,* 155 So.2d 883 (Fla.App.1963); *Matter of Estate of Glass,* 175 Kan. 246, 262 P.2d 934 (1953); *Williams v. West,* 258 S.W.2d 468

(Ky.1953); *Lieberman v. Lieberman,* 517 S.W.2d 478 (Mo.App.1974); *Kruvant v. Kruvant,* 100 N.J.Super. 107, 241 A.2d 259 (1968); *Sayne v. Sayne,* 39 Tenn.App. 422, 284 S.W.2d 309 (1955); *Commonwealth v. Shepard,* 212 Va. 843, 188 S.E.2d 99 (1972); Annot., 1 A.L.R.2d 910 (1948).

■ We, therefore, conclude that parents may in a wrongful birth action recover the extraordinary costs for rearing a child with birth defects not only during his minority, but also after the child reaches the age of majority if the child is unable to support himself because of physical or emotional disabilities.

Because the trial court erred in holding that the parents could not recover the extraordinary child-rearing costs after the child reached the age of majority, this case must be reversed.

The certified questions having been answered in the first case, it is dismissed.

No. CC944—Certified Questions Answered and Dismissed.

No. 16426—Reversed and Remanded.