**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 15-2161**

_____

MISTY SIMMS, next friend of C.J., an infant, and individually,

        Plaintiffs - Appellees,

    v.

UNITED STATES OF AMERICA,

        Defendant - Appellant,

    and

RICHARD BOOTH, M.D.; VALLEY HEALTH SYSTEMS, INC.; UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES,

        Defendants.

_____

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert C. Chambers, Chief District Judge. (3:11-cv-00932)

_____

Argued: January 27, 2016        Decided: October 7, 2016

_____

Before WYNN and HARRIS, Circuit Judges, and Loretta C. BIGGS, United States District Judge for the Middle District of North Carolina, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Harris and Judge Biggs joined.

_____

**ARGUED**: Edward Himmelfarb, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Mark Davis Moreland, MORELAND & MORELAND, Lewisburg, West Virginia, for Appellees. **ON BRIEF**: Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; R. Booth Goodwin II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellant. Rachel Hanna, LAW OFFICE OF RACHEL HANNA, Lewisburg, West Virginia, for Appellees.

WYNN, Circuit Judge:

Plaintiff Misty Simms brought this "wrongful birth" action against the United States under the Federal Tort Claims Act ("FTCA") after her prenatal care provider--a federally-supported health center--failed to timely inform her that her child would be born with severe congenital abnormalities. Following a bench trial, the district court found in favor of Simms and awarded her over $12 million in economic and noneconomic damages.

The government appeals the award of damages for past and future medical expenses and the district court's decision not to order the creation of a reversionary trust for future medical expenses. After careful review, we conclude that the district court properly awarded Simms damages attributable to her child's past medical expenses. We further conclude that the district court correctly measured Simms' damages using the amount medical providers billed for her child's care, rather than the amount the West Virginia Medicaid program paid those providers. But the district court erred in failing to hold a post-verdict, prejudgment collateral source hearing. Accordingly, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

A.

Simms received prenatal care at Valley Health Systems, Inc. ("Valley Health"), a federally-supported health care center located in West Virginia. On February 25, 2008, when Simms was eighteen weeks pregnant, her Valley Health physician detected potential fetal abnormalities during a routine ultrasound. But due to errors on its part, Valley Health did not inform Simms of the abnormalities until May 2008, three months later. In a series of follow-up appointments, Simms learned that the fetus's brain was extremely underdeveloped, and, if not stillborn, her child would never walk or talk and would be severely mentally disabled. Because at that point Simms was well into her third trimester, the laws of West Virginia and nearby states barred Simms from terminating her pregnancy.

On June 18, 2008, Simms gave birth to her son, C.J. C.J. survived birth but, as expected, suffered severe brain malformation and multiple other related developmental and muscular conditions. As a result, C.J. lives in what his physicians refer to as a "vegetative state." And although C.J. is able to live at home with Simms, he requires twenty-four-hour care and monitoring. To date, the extraordinary medical bills

4

resulting from the requisite care provided for C.J. have been paid by West Virginia's Medicaid and Medicaid Waiver programs.[1]

B.

On November 21, 2011, Simms filed this wrongful birth action individually, and on behalf of her son, C.J., in the United States District Court for the Southern District of West Virginia. Because Valley Health is a federally-supported health center, Simms sought relief under the FTCA. See 42 U.S.C. § 233(g).

Because this case arises under the FTCA, the law of West Virginia—-the state where Valley Health's negligent act took place—-governs. See 28 U.S.C. § 1346(b)(1); Starns v. United States, 923 F.2d 34, 37 (4th Cir. 1991); see also 28 U.S.C. § 2674 (providing that "[t]he United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances"). We therefore apply the law of West Virginia in evaluating the government's claims. See Myrick v. United States, 723 F.2d 1158, 1159 (4th Cir. 1983). To the extent we are faced with an unsettled issue of West Virginia law, our task is "to predict how [the state's highest] court would rule if presented with the issue." Ellis v. La.-

---

[1] In this opinion, we refer to West Virginia's Medicaid and Medicaid Waiver programs collectively as the "West Virginia Medicaid program" or "Medicaid."

Pac. Corp., 699 F.3d 778, 782–83 (4th Cir. 2012) (internal quotation omitted); see Midwest Knitting Mills, Inc. v. United States, 950 F.2d 1295, 1298 (7th Cir. 1991).

In West Virginia, "[t]he failure of a [healthcare provider] to discover a birth defect and to advise the parents of its consequences will give rise to a cause of action" for "wrongful birth." James G. v. Caserta, 332 S.E.2d 872, 882 (W. Va. 1985). The theory underlying a wrongful birth action is that the provider's failure to advise of the birth defect caused the parents to lose the opportunity make an informed decision as to whether to terminate the pregnancy. Id. at 879.

After a bench trial, the district court issued a memorandum opinion and order finding the government liable. Simms v. United States, 107 F. Supp. 3d 561, 563–64 (S.D.W. Va. 2015). The court held that Valley Health's failure to provide follow-up care after the February 25, 2008, ultrasound "proximately caused [Simms] to be deprived of essential information" regarding the fetus's condition and thereby "prevent[ed] [Simms] from exercising her right to terminate [the] pregnancy." Id. at 567. The court entered judgment in favor of Simms individually and dismissed the claim brought by Simms on C.J.'s behalf, holding that C.J. did not have a cause of action for wrongful birth under West Virginia law. Id. at 563 n.1.

6

The district court awarded Simms a total of $12,222,743 in damages, distributed as follows: (1) $2,722,447 for past billed medical expenses, (2) $8,683,196 for future medical expenses—the present value of the projected future medical costs for C.J.'s care over a twenty-one-year life expectancy, (3) $175,526 for lost income, and (4) $641,544 in noneconomic damages.[2] The government timely appealed.

## II.

On appeal to this Court, the government does not challenge the district court's liability determination. Rather, the government disputes the district court's award of damages attributable to C.J.'s past and future medical expenses.[3]

We review the district court's conclusions of law, including those regarding the availability and calculation of damages, de novo. See Rice v. Cmty. Health Ass'n, 203 F.3d 283, 287 (4th Cir. 2000). We review factual findings relating to the calculation of damages for clear error. United States ex rel.

---

[2] The district court's memorandum opinion and order indicates a different damages award. See Simms, 107 F. Supp. 3d at 579–80. Following initial entry of judgment, the district court entered an amended judgment order revising the damages award to account for a clerical error in the damages calculation.

[3] Shortly after oral argument, in response to Simms's unopposed motion, we entered an order partially affirming the district court's judgment with respect to the undisputed portion of the damages award for lost income and noneconomic damages.

Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co., 86 F.3d 332, 334 (4th Cir. 1996) (per curiam).

A.

In its appeal, the government challenges the district court's award of damages for past and future medical expenses on a number of grounds, each relating to the West Virginia Medicaid program's payment of C.J.'s medical expenses. The government first contends that Simms does not have a right to recover past medical expenses because, in light of C.J.'s Medicaid coverage, Simms has not, to date, paid out-of-pocket for C.J.'s medical care. According to the government, awarding Simms damages related to medical care costs she did not incur would contravene the basic tort principle that damages must compensate only for actual loss. We disagree.

Under West Virginia law, a parent who successfully brings a wrongful birth suit against a healthcare provider is entitled to recover the "extraordinary costs for rearing a child with birth defects." Caserta, 332 S.E.2d at 882; see id. at 878 n.12 ("[T]he rule is that the . . . costs of extraordinary child care arising from the defects are recoverable in a wrongful birth action."). These damages include "the medical or educational costs attributable to the birth defect during the child's minority" as well as medical and support costs "after the child reaches the age of majority if the child is unable to support

8

himself." Id. at 882–83. The entitlement to such recovery stems from parents' legal duty to support their children. Id.; see State ex rel. Packard v. Perry, 655 S.E.2d 548, 554 (W. Va. 2007) ("[P]arents ha[ve] a duty to support their child, and in turn [are] therefore obligated to pay for their child's medical expenses."); see also 67A C.J.S. Parent and Child § 167 (2016) ("Each parent has a duty to support his or her minor children.").

Here, the fact that Simms has not had to pay out-of-pocket for C.J.'s past medical care does not obviate her injury. Simms has a legal obligation to support her child and the weight of that obligation increased as a result of Valley Health's negligence. And the fact that Medicaid has, to date, paid C.J.'s medical costs does not change this analysis.

West Virginia has long recognized the common law "collateral source rule," which is "an exception to the general rule that in a tort action, the measure of damages is that that will compensate and make the plaintiff whole." 25 C.J.S. Damages § 189 (2016); see Kenney v. Liston, 760 S.E.2d 434, 440 (W. Va. 2014). "The collateral source rule protects payments made to or benefits conferred upon an injured party from sources other than the tortfeasor by denying the tortfeasor any corresponding offset or credit against the injured party's damages." Kenney, 760 S.E.2d at 440. The rationale underlying

9

the collateral source rule is that "it is better for injured plaintiffs to receive the benefit of collateral sources in addition to actual damages than for defendants to be able to limit their liability for damages merely by the fortuitous presence of these sources." Id. at 445 (citation omitted) (internal quotation marks omitted); see also Ilosky v. Michelin Tire Corp., 307 S.E.2d 603, 615 (W. Va. 1983) ("The purpose of the collateral source doctrine is to prevent reduction in the damage liability of defendants simply because the victim had the good fortune to be insured or have other means of compensation.").

The collateral source rule protects Medicaid payments. Kenney, 760 S.E.2d at 433–34. Accordingly, under the collateral source rule, the government is not entitled to a credit or offset against Simms' damages based on Medicaid's payment of C.J.'s medical expenses. We therefore reject the government's argument that common law tort principles preclude Simms from recovering damages related to C.J.'s past medical expenses.

B.

The government further contends that, even if the collateral source rule applies and Simms is entitled to recover damages attributable to C.J.'s past medical expenses, the district court erred in calculating those damages because the

10

court used the amount C.J.'s medical providers billed for his care, rather than the amount the Medicaid program actually paid.

Under West Virginia law, the "proper measure of damages [for medical expenses] is not simply the expenses or liability incurred, or that which may be incurred in the future, but rather the [r]easonable value of medical services made [n]ecessary because of the injury." Jordan v. Bero, 210 S.E.2d 618, 637 (W. Va. 1974); see also Delong v. Kermit Lumber & Pressure Treating Co., 332 S.E.2d 256, 258 (W. Va. 1985) ("The proper measure of damages for future medical expenses is 'the reasonable value of medical services as will probably be necessary by reason of the permanent effects of a party's injuries.'" (citation omitted)). Thus, when a tortfeasor causes a plaintiff an injury requiring medical services, the plaintiff is entitled to recover the reasonable value of those services, regardless of the amount actually paid or whether the services were rendered gratuitously. Kenney, 760 S.E.2d at 445-46.

In Kenney, the West Virginia Supreme Court of Appeals addressed the application of the collateral source rule in situations in which a healthcare provider discounts or writes off a portion of a medical bill pursuant to an agreement with a plaintiff's health insurer. Id. at 439-40. The court held that, under the collateral source rule, a plaintiff is entitled to "the total amount billed by his medical providers absent his

11

health insurance coverage," and therefore, that "[t]he tortfeasor is not entitled to receive the benefit of the reduced, discounted or written-off amount." Id. at 446.

The government principally attempts to distinguish Kenney on grounds that Kenney dealt with discounts obtained by a private insurer, whereas the West Virginia Medicaid program reimbursed C.J.'s medical costs. But the Kenney Court drew no such distinction between benefits conferred by private and governmental entities. To the contrary, Kenney held that benefits rendered by "social legislation" "are not [to be] subtracted from a plaintiff's recovery." Id. at 445–46; see also id. at 446 ("[T]he law does not differentiate between the nature of . . . collateral source benefits . . . ."). And Kenney identified benefits conferred by numerous specific governmental entities and programs--including Medicaid--as falling within the collateral source rule. Id. at 628-632 (identifying as collateral sources "veteran's and military hospitals," "government pension programs such as Social Security," "other government programs like Medicare and Medicaid," and "social services," among others). Accordingly, Kenney provides no basis to distinguish between benefits conferred by public and private payers.

The government also suggests that the difference between the amount billed by C.J.'s medical providers and the amount

12

paid by Medicaid does not constitute a "benefit" for purposes of the collateral source rule because C.J.'s providers were required by federal law to accept the amount paid by Medicaid as payment in full. But Kenney expressly refused to restrict the universe of benefits protected by the collateral source rule to "payments" made to a plaintiff or on a plaintiff's behalf, explaining that "the collateral source rule applies to any benefit received by a plaintiff from any source in line with the plaintiff's interests." Id. at 445; see also id. at 440 ("The collateral source rule protects payments made to or benefits conferred upon an injured party from sources other than the tortfeasor . . . ." (emphasis added)). And the Kenney court specifically identified discounted rates negotiated by payers as one type of "benefit" subject to the collateral source rule. Id. at 445-46 ("The damage is sustained when the plaintiff incurs the liability, and the method by which that liability is later discharged has no effect on the measure of damages." (internal quotation omitted)). That C.J.'s medical providers accepted the discounted reimbursement rates as condition of participation in the Medicaid program rather than a private insurance plan does not change the analysis because, as explained above, the West Virginia collateral source rule does not distinguish between benefits conferred by public and private entities.

13

Accordingly, we conclude that, as a matter of West Virginia law, regardless of whether a provider decides to discount a medical bill by agreement with a private health insurer or by virtue of voluntary participation in the Medicaid program, proof of the original medical bill remains "prima facie evidence the expense was necessary and reasonable." Id. at 438. The district court, therefore, did not err in calculating Simms' damages award using the amount C.J.'s medical providers billed the Medicaid program.

C.

Finally, we address the government's argument that the district court erred in refusing to reduce the damages award under the provisions of West Virginia's Medical Professional Liability Act (the "Professional Liability Act").

The Professional Liability Act modifies the common law collateral source rule in the context of medical professional liability actions, like the instant case. Manor Care, Inc. v. Douglas, 763 S.E.2d 73, 87 (W. Va. 2014); see W. Va. Code § 55-7B-9a. The statute entitles a defendant to a post-verdict, prejudgment hearing regarding payments received by the plaintiff from collateral sources. W. Va. Code § 55-7B-9a(a) ("[A] defendant who has been found liable to the plaintiff for damages for medical care, rehabilitation services, lost earnings or other economic losses may present to the court, after the trier

14

of fact has rendered a verdict, but before entry of judgment, evidence of payments the plaintiff has received for the same injury from collateral sources."). At the hearing, if the court finds that certain statutory preconditions are met, the defendant may also "present evidence of future payments from collateral sources." Id. § 55-7B-9a(b) (emphasis added). After making findings based on the evidence, the court then reduces the economic damages award by the "net amount of collateral source payments received or to be received by the plaintiff" before entering judgment. Id. § 55-7B-9a(f). The court may not reduce the award, however, with respect to any amounts "which the collateral source has a right to recover from the plaintiff through subrogation, lien, or reimbursement." Id. § 55-7B-9a(g)(1). Medicaid payments qualify as collateral source payments under the Professional Liability Act. See id. § 55-7B-2(b) (defining the term "[c]ollateral source" to include "[a]ny federal or state act, public program or insurance which provides payments for medical expenses").

Here, the district court did not hold a collateral source hearing before it entered judgment. Instead, the district court ruled that, as a matter of law, the Professional Liability Act did not entitle the government to any damages reduction because "the West Virginia state Medicaid program has a subrogation lien against any verdict in Plaintiffs' favor." Simms v. United

15

States, No. CIV.A. 3:11-0932, 2015 WL 128101, at *3 (S.D.W. Va. Jan. 8, 2015).

The district court did not explain its basis for concluding that the Medicaid program holds a subrogation lien against Simms' judgment. And the parties disagree as to whether the Medicaid program holds such a lien. In particular, Simms asserts that the Medicaid program holds a subrogation lien by virtue of Section 9-5-11(b), which provides that when a Medicaid "recipient" recovers damages from a third party related to medical expenses previously paid by the Medicaid program, the state Medicaid agency holds a "priority right to be paid first" out of the recovery. W. Va. Code § 9-5-11(b)(6). To that end, the West Virginia Medicaid program "shall be legally subrogated to the rights of the recipient." Id. § 9-5-11(b)(5). By contrast, the government argues that Section 9-5-11 does not apply because C.J.--not Simms--is the Medicaid "recipient" for purposes of the subrogation provision. See id. § 9-5-11(a)(3) (defining "[r]ecipient," "unless the context otherwise requires," as "a person who applies for and receives assistance under the Medicaid Program").

Because the district court did not squarely address the government's argument that Simms does not qualify as a

16

"recipient" under W. Va. Code § 9-5-11,[4] we believe the district court should have held a collateral source hearing before entering judgment in Simms' favor. Accordingly, remand is warranted so the district court can determine, in the first instance, whether Simms, in her individual capacity, qualifies as a "recipient" under W. Va. Code § 9-5-11. See Am. Foreign Serv. Ass'n v. Garfinkel, 490 U.S. 153, 160 (1989) ("[B]ecause appellants' argument raises a question of statutory interpretation not touched upon by the [d]istrict [c]ourt, we leave these matters for that court to decide in the first instance.").

A collateral source hearing is necessary for several additional reasons. First, even if the state Medicaid program does not hold a subrogation lien by virtue of Section 9-5-11(b), the state of West Virginia may have "a right to recover" the amount it has paid for C.J.'s medical care by some other means that would bar the district court from reducing Simms' award. To that end, Simms contends that the Medicaid application she

_____

[4] The district court never addressed whether Medicaid held a subrogation lien against Simms because, before trial, the court ruled that Medicaid had a subrogation lien against C.J., who was still a party to the action at that point. Simms, 2015 WL 128101, at *3. Neither party appears to have disputed that ruling. After trial, the district court dismissed C.J. as a plaintiff, see Simms, 107 F. Supp. 3d at 563 n.1, making it necessary for the court to determine whether Medicaid's lien against any recovery by C.J. extends to recoveries by Simms.

17

completed and signed on C.J.'s behalf gives the Medicaid program a right to seek reimbursement related to any damages she recovers. The record, however, does not include a copy of Simms' Medicaid application so we are in no position to evaluate that argument. Complicating matters further, the government asserts that there are "lien letters" demonstrating that any lien asserted by the state of West Virginia runs only against a damages award for C.J., not Simms. Reply Br. at 8. Again, we can find nothing in the record establishing the existence of such letters, let alone their contents. We believe a collateral source hearing is the proper vehicle for the parties to present such evidence for consideration by the district court in the first instance.

Finally, regardless of whether West Virginia has a right to reimbursement with respect to the damages awarded for past medical expenses, such a right would not resolve whether the Professional Liability Act requires a reduction in the damages award for future medical expenses. See W. Va. Code § 9-5-11(g)(3) (indicating that the amount the West Virginia Medicaid program may recoup shall "not exceed the amount of past medical expenses paid"). Under the statute, a liable defendant "may present evidence of future payments from collateral sources" and receive a damages reduction on account thereof, if the court finds that:

18

> (1) There is a preexisting contractual or statutory obligation on the collateral source to pay the benefits;
>
> (2) The benefits, to a reasonable degree of certainty, will be paid to the plaintiff for expenses the trier of fact has determined the plaintiff will incur in the future; and
>
> (3) The amount of the future expenses is readily reducible to a sum certain.

Id. § 55-7B-9a(b). The district court did not make any findings—-one way or the other—-as to these three statutory preconditions before it entered judgment.

Accordingly, we vacate the district court's judgment solely with respect to damages awarded for past and future medical expenses and remand the case to the district court so that it may hold a collateral source hearing. At the hearing, the court should accept evidence from the parties, hear argument, and decide whether, and to what extent, the Professional Liability Act entitles the government to a damages reduction. Among other issues, the court should address whether, in light of C.J.'s dismissal, West Virginia's Medicaid program may recover from Simms "through subrogation, lien or reimbursement," W. Va. Code § 55-7B-9a(g)(1), some or all of the damages awarded for past medical expenses. The district court also should determine whether Medicaid has any other "right to recover" against Simms. In addition, the district court should make findings relevant to the issue of future collateral source

19

payments, including whether there is a "reasonable degree of certainty" that C.J.'s medical care will continue to be covered by West Virginia's Medicaid program.[5]  Id. § 55-7B-9a(b)(2).

### III.

For the foregoing reasons, we vacate the district court's judgment solely with respect to damages award for past and future medical expenses and remand to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

---

[5] Because we remand for a collateral source hearing under the Professional Liability Act, we need not--and thus do not--address Defendant's alternative argument that there should be a damages setoff to account for the financial contribution the federal government made to the West Virginia Medicaid program. Additionally, on remand, the district court may consider anew, if the issue arises, whether it is an appropriate exercise of its discretion to order the creation of a reversionary trust.

20